# ST. LOUIS, IRON MOUNTAIN AND SOUTHERN RAILWAY COMPANY *v.* KNIGHT.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Argued May 3, 1887. — Decided May 23, 1887.

A bill of lading, acknowledging the receipt by a common carrier of " the following packages, contents unknown . . . marked and numbered as per margin, to be transported" to the place of destination, is not a warranty, on the part of the carrier, that the goods are of the quality described in the margin.

P. shipped by rail a large quantity of cotton at different times, and at different points south of Texarkana, Ark., to be made up into bales there at a compress-house, and to be thence forwarded to various destinations North and East. The work at the compress house was to be done by the carrier, but under direction of the shipper, who had control of the cotton there for that purpose, and who superintended the weighing, the classing, and the marking of it, and who selected for shipment the particular bales to fill the respective orders at the points of destination. Bills of lading for it were issued from time to time by the agents of the railroad company, sometimes in advance of the separation by P. of particular bales from the mass to correspond with them. P. was in the habit of drawing against shipments with bills of lading attached, and his drafts were discounted at the local banks. When shipments were heavy, drafts would often mature before the arrival of the cotton. 525 bales, marked on the margin as of a particular quality, were so selected and shipped to K. at Providence, Rhode Island. The bill of lading described them as " contents unknown," " marked and numbered as per margin." The contents of the bales on arrival were found not to correspond with the marks on the margin. The consignee had honored the draft before the arrival of the cotton. He refused to receive the cotton, and sold it on account of the railroad company, after notice to it, and sued in *assumpsit*, on the bill of lading, to recover from the company, as a common carrier, the amount of the loss. *Held*,

(1) That the bill of lading was not a guarantee by the carrier that the cotton was of the quality described in the margin;

(2) That if the railroad company was liable as warehouseman, that liability could not be enforced under this declaration; nor, under the circumstances of this case, by the consignee of the cotton;

(3) That the company was not liable as a common carrier from points south of Texarkana for the specific bales consigned to K.;

(4) That its liability as common carrier began only when specific lots
        were marked and designated at Texarkana, and specifically set
        apart to correspond with a bill of lading then or previously is-
        sued.

In Illinois, under an unverified plea of the general issue in assumpsit
    against a common carrier for goods lost, the defendant may at the trial
    deny his liability under the bill of lading; § 34 of the Practice Act hav-
    ing no application to such a denial.


ASSUMPSIT against plaintiff in error, defendant below, as a
common carrier, to recover on a bill of lading for goods not
delivered. Judgment for plaintiffs. Defendant sued out this
writ of error. The case is stated in the opinion of the court.


*Mr. John F. Dillon* for plaintiff in error cited: *Walker* v.
*Brewer*, 11 Mass. 99; *Lickbarrow* v. *Mason*, 2 T. R. 63, 77;
*Grant* v. *Norway*, 10 C. B. 665; *Hubbersty* v. *Ward*, 8 Exch.
330; *Brown* v. *Powell Duffryn Co.*, L. R. 10 C. P. 562; *The
Freeman* v. *Buckingham*, 18 How. 182; *The Loon*, 7 Blatch-
ford, 244; *Robinson* v. *Memphis, &c., Railway Co.*, 9 Fed.
Rep. 129; S. C. 16 Fed. Rep. 57; *Pollard* v. *Vinton*, 105
U. S. 7; *Sears* v. *Wingate*, 3 Allen, 103; *Baltimore & Ohio
Railroad* v. *Wilkens*, 44 Maryland, 11; *Hunt* v. *Mississippi
Central Railroad*, 29 La. Ann. 446; *Louisiana Bank* v. *La-
veille*, 52 Missouri, 380; *Chandler* v. *Sprague*, 38 Am. Dec. 407,
note; *Cox* v. *Bruce*, 18 Q. B. D. 147; *Miller* v. *Hannibal &
St. Joseph Railroad*, 90 N. Y. 430; *The L. J. Farwell*, 8 Bissell,
61; *Rowley* v. *Bigelow*, 12 Pick. 307 [*S. C.* 23 Am. Dec. 607];
*Haddow* v. *Parry*, 3 Taunt. 303; *Jessel* v. *Bath*, L. R. 2 Exch.
267; *Lebeau* v. *General Steam Nav. Co.*, L. R. 8 C. P. 88;
*Clark* v. *Barnwell*, 12 How. 272; *The Columbo*, 3 Blatchford,
521; *630 Casks of Sherry Wine*, 7 Ben. 506, 509; S. C. 14
Blatchford, 517; *Bissel* v. *Price*, 16 Ill. 408; *Barrett* v. *Rog-
ers*, 7 Mass. 297 [*S. C.* 5 Am. Dec. 45]; *Shepherd* v. *Naylor*,
5 Gray, 591; *Michigan Southern Railroad* v. *Shurtz*, 7 Mich.
515; *Platt* v. *Hibbard*, 7 Cowen, 497; *St. Louis, &c., Railroad*
v. *Montgomery*, 39 Ill. 335; *Roskell* v. *Waterhouse*, 2 Starkie,
461; *O'Neil* v. *New York Central Railroad*, 60 N. Y. 138;
*Barron* v. *Eldredge*, 100 Mass. 455.

*Mr. Julius Rosenthal* and *Mr. Abram M. Pence* for defendants in error, submitted on their brief, citing: *Rowley* v. *Bigelow*, 12 Pick. 307 [*S. C.* 23 Am. Dec. 607]; *Stevenson* v. *Farnsworth*, 2 Gilman, 715; *Gaddy* v. *McCleave*, 59 Ill. 182; *Templeton* v. *Hayward*, 65 Ill. 178; *Dwight* v. *Newell*, 15 Ill. 333; *Walker* v. *Krebaum*, 67 Ill. 252; *The Idaho*, 93 U. S. 575; *Robinson* v. *Memphis, &c., Railway*, 16 Fed. Rep. 57, 60; *Moulor* v. *American Life Insurance Co.*, 111 U. S. 335; *Indianapolis, &c., Railroad Co.* v. *Horst*, 93 U. S. 291; *Beaver* v. *Taylor*, 93 U. S. 46; *Beckwith* v. *Bean*, 98 U. S. 266; *Ottawa & Fox River Railroad* v. *McMath*, 91 Ill. 111; *St. Louis & Iron Mt. Railroad* v. *Larned*, 103 Ill. 293; *Armour* v. *Mich. Central Railroad*, 65 N. Y. 111; *Bank of Pittsburgh* v. *Neal*, 22 How. 96.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This is an action of assumpsit brought by the defendants in error against the St. Louis, Iron Mountain and Southern Railway Company in the Superior Court of Cook County, Illinois, and removed into the Circuit Court of the United States for the Northern District of Illinois by the defendant below, the parties being citizens of different states. The declaration set out several similar causes of action in different counts against the railway company as a common carrier, in one of which it was alleged that the defendant, having received from one G. T. Potter a large number of bales of cotton, described in a certain bill of lading acknowledging receipt thereof, thereby agreed safely to carry the same from Texarkana, in the state of Arkansas, to St. Louis, in the state of Missouri, and thence to Woonsocket, in the state of Rhode Island; and avers that, in violation of its promise and duty, and by reason of its negligence, the said goods became and were wholly lost. The plaintiffs below sued as purchasers of the cotton from Potter and assignees of the bills of lading. The bills of lading sued upon were similar in their tenor, except as to the description of the articles named therein, and commenced as follows: "Received from G. T. Potter the following packages, contents unknown, in apparent good order, marked and numbered as

per margin, to be transported from Texarkana, Ark., to St. Louis, and delivered to the consignee or a connecting common carrier." A specimen of what was contained on the margin is as follows :

" Marked,                    List of articles.                    Weight.
" [P P]   Seventy-four bales cotton, adv. ch'g's $111.00   35,964
" Order shipper notify —

　　　　　　　　　　" B. B. and R. KNIGHT,
　　　　　　　　　　　　" *Providence, R. I.*

" Deliver cotton Woonsocket, R. I."

Some of the bills of lading specified that the goods were to be transported from Texarkana to Providence, R. I., to be forwarded from St. Louis to destination. The whole number of bales in controversy is 525.

To the declaration the defendant filed a plea of the general issue, which was not verified.

The ground of the complaint on the part of the plaintiffs was, not that they did not receive the whole number of bales called for by the bills of lading, but that, as to the 525 bales in controversy, they were not of the grade and quality designated by the marks contained in the bills of lading. By reason of this difference in quality, on the arrival of the cotton at destination, the plaintiffs refused to receive the same, and, after notice to the defendant, caused the same to be sold for its account. The amount claimed was the loss thereby incurred.

The cause was tried by a jury, and a verdict and judgment rendered for the plaintiffs for $11,808.51. A bill of exceptions, duly taken, sets out the entire evidence given on the trial, and the charge of the court to the jury, with the exceptions taken by the plaintiff in error.

The court below in its charge to the jury gave in outline a statement of the main features of the case sufficient for present purposes, as follows :

" The proof tends to show that Potter was a cotton broker at Texarkana, Arkansas, in the fall of 1879 and winter following; that he bought most of his cotton at points in Texas on

the lines of railroads running south and southwest and west from Texarkana, and that it was brought to Texarkana by these railroads and there delivered upon the platform of what is known in the testimony as the cotton compress company; that this compress company was a corporation whose business it was to compress cotton, and that all the cotton bought by Potter and delivered at Texarkana was to be there compressed before it was shipped East and North by the defendant. This compress company had a large warehouse, where cotton was stored until it could be compressed and made ready for shipment.

"The testimony tends to show the course of business to have been this: Cotton was bought by Potter and delivered into the compress house. It was there weighed, classed, or graded by Potter, and marks put upon each bale indicating the grade or quality of the cotton and the lot to which it belonged. When Potter had so weighed, graded, and marked a number of bales, he made out a bill of lading, describing certain bales of cotton by the marks on the bales; had the superintendent of the compress company warehouse certify to the fact that the cotton called for by these bills of lading was in the warehouse, and the bills of lading thus certified to by the letters 'O K' and the signature of Martin, the superintendent of the compress warehouse, were signed by O'Connor, the freight agent of the defendant at Texarkana. Potter then drew drafts on the persons to whom he had sold cotton of the grade called for by these bills of lading, attached these bills of lading to the drafts, and some local bank at Texarkana or some of the adjacent towns or cities cashed these drafts, and they went forward to some correspondent of such bank for collection, and in due course of mail and long before the actual arrival of the cotton the drafts were paid; and this seems, from the proof, to have been the course of business between the plaintiffs and Potter.

"There is also testimony in the case, given by Potter himself, which tends to show that the bills of lading were issued upon cotton before it had been received into the warehouse upon some understanding or agreement between Potter and

O'Connor that they should be so issued, and that Potter would afterwards put the cotton to respond to those bills of lading into the warehouse.

" It is conceded that the defendant, and it is in fact provided in the bills of lading, that the defendant, the railroad company, should compress this cotton before shipping to the North or East, and that the expense of compressing was paid by the defendant out of its charges for transportation; that some time necessarily elapsed between the arrival of the cotton in the compress warehouse and the time when it was compressed and made ready for shipment. Especially was this so in the fall and early part of the winter, when there was a large rush on cotton and it was impossible to compress and handle the cotton as fast as it came in. The cotton therefore accumulated in large quantities in the compress house, awaiting compression and getting ready for shipment.

" And there is also proof in the case tending to show that when it was ready for shipment it was turned out on what was known as the loading platform, and was there shipped to such consignees as Potter directed — that is, bills of lading having been given to various persons, Potter directed to whom he would have each lot, as it was turned out ready for shipment, sent or forwarded.

" The controversy in this case is wholly in regard to 525 bales of cotton covered by the eight bills of lading offered in evidence in this case. These bills of lading, as you will remember, covered a large amount of other cotton which it is conceded was received in due course of business, and answered to the marks of quality which were upon the bales; but it is claimed on the part of the plaintiffs that 525 bales of the whole number of bales covered by the bills of lading were not of the quality called for by these bills of lading, and this suit is wholly in regard to those.

" The plaintiffs claim that, on or about the 9th of April, 1880, there still remained unshipped from Texarkana and in the compress warehouse 525 bales of this cotton, for which they held bills of lading; that, on or about the 9th of April, there remained in the compress house about 800 bales of cotton

of an inferior grade to that indicated by the marks on the cotton called for by these bills of lading; and that certain employes of Potter, as plaintiffs insist, with the knowledge of O'Connor, the defendant's freight agent, re-marked this cotton with marks indicating the grade or quality called for by the bills of lading; and the defendant forwarded this inferior cotton to the plaintiffs instead of the actual quality called for by these bills of lading.

" The plaintiffs' proof also tends to show that when this inferior cotton arrived at its destination, Providence, Rhode Island, plaintiffs declined to accept it, caused it to be put into an auction house, and sold for the benefit of whom it might concern, notified the defendant of what they had done before this sale took place, giving the defendant opportunity to reclaim and take the cotton if it saw fit and dispose of it itself; and this suit is now brought to recover the difference between the proceeds of this inferior cotton, as the plaintiffs claim, and the drafts and freight they have paid."

It is not denied that the railroad company delivered to the plaintiffs below the whole number of bales of cotton mentioned in the bills of lading, with external marks thereon as called for, and that no change was made in the cotton or in the marking thereof after it was loaded on the cars for transportation at Texarkana, and that no damage or loss was occasioned by reason of any want of care or diligence in the transportation. The bill of lading contains no warranty that the goods described shall answer any particular quality; on the contrary, it expressly specifies that the contents of the packages are unknown. That a bill of lading in such cases does not operate as such a guaranty appears from the case of *Clark* v. *Barnwell*, 12 How. 272, where Mr. Justice Nelson, delivering the opinion of the court (p. 283), said : " It is obvious, therefore, that the acknowledgment of the master as to the condition of the goods when received on board extended only to the external condition of the cases, excluding any implication as to the quantity or quality of the article, condition of it at the time received on board, or whether properly packed or not in the boxes."

The observations of the Master of the Rolls, Lord Esher, in the case of *Cox* v. *Bruce*, 18 Q. B. D. 147, are very much in point. He says: "But, then, secondly, it is said that, because the plaintiffs are indorsees for value of the bill of lading without notice, they have another right, that they are entitled to rely on a representation made in the bill of lading that the bales bore such and such marks, and that there is consequently an estoppel against the defendants. That raises a question as to the true meaning of the doctrine in *Grant* v. *Norway*, 10 C. B. 665. It is clearly impossible, consistently with that decision, to assert that the mere fact of a statement being made in the bill of lading estops the shipowner and gives a right of action against him if untrue, because it was there held that a bill of lading signed in respect of goods not on board the vessel did not bind the shipowner. The ground of that decision, according to my view, was not merely that the captain has no authority to sign a bill of lading in respect of goods not on board, but that the nature and limitations of the captain's authority are well known among mercantile persons, and that he is only authorized to perform all things usual in the line of business in which he is employed. Therefore the doctrine of that case is not confined to the case where the goods are not put on board the ship. That the captain has authority to bind his owners with regard to the weight, condition, and value of the goods under certain circumstances may be true; but it appears to me absurd to contend that persons are entitled to assume that he has authority, though his owners really gave him no such authority, to estimate and determine and state on the bill of lading, so as to bind his owners, the particular mercantile quality of the goods before they are put on board, as, for instance, that they are goods containing such and such a percentage of good or bad material, or of such and such a season's growth. To ascertain such matters is obviously quite outside the scope of the functions and capacities of a ship's captain and of the contract of carriage with which he has to do."

It follows, therefore, that if any liability attached to the plaintiff in error upon these bills of lading, it must be by

reason of what occurred prior to the actual loading of the cotton upon the cars at Texarkana, when the transportation actually commenced. If Potter had never delivered to the plaintiff in error any cotton at all to make good the 525 bales called for by the bills of lading, it is clear that the plaintiff in error would not be liable for the deficiency. This is well established by the cases of *The Schooner Freeman* v. *Buckingham*, 18 How. 182, and *Pollard* v. *Vinton*, 105 U. S. 7: In the latter case, Mr. Justice Miller, delivering the opinion of the court, and speaking of the nature and effect of a bill of lading, says: "It is an instrument of a twofold character. It is at once a receipt and a contract. In the former character, it is an acknowledgment of the receipt of property on board his vessel by the owner of the vessel. In the latter, it is a contract to carry safely and deliver. The receipt of the goods lies at the foundation of the contract to carry and deliver. If no goods are actually received, there can be no valid contract to carry or to deliver." And the doctrine is applicable to transportation contracts made in that form by railway companies and other carriers by land, as well as carriers by sea. *Baltimore & Ohio Railroad* v. *Wilkens*, 44 Maryland, 11; *Miller* v. *Hannibal & St. Joseph Railroad*, 90 N. Y. 430. *A fortiori* the carrier is not responsible, as we have already seen, for a deficiency in the quality as compared with that described in the bill of lading if he safely delivers the very goods he actually received for transportation.

It becomes necessary, therefore, further to inquire what facts, happening before the actual loading of the cotton in question on the cars of the plaintiff in error at Texarkana, create a liability on its part to make good the loss complained of by reason of its duty as a common carrier under the bills of lading sued on. On this point, the court below charged the jury as follows:

"1st. This compress warehouse must be deemed the warehouse of the defendant. If you find from the proof that it was used by the defendant as the place for storing the cotton while the defendant was compressing the same — that is, if while the defendant was getting the cotton ready for shipment

north it used the compress warehouse for the purpose of storage, then the compress warehouse must be deemed the defendant's warehouse for that purpose.

"2d. The proof without controversy seems to be that it was understood between Potter and the defendant that all the cotton covered by these bills of lading was to be compressed before it was to be put on the defendant's cars for actual transportation. While it remained in the compress house for compression, awaiting further shipment, the defendant's liability was that of a warehouseman only, and not that of a carrier; that is, the defendant was liable for due and ordinary care, such as warehousemen are expected to take of property placed in a warehouse for keeping. A common carrier's liability is of an extraordinary character, and covers every risk that the property can be subject to, except a loss by the act of God or by an unavoidable accident, and by the public enemy, unless this extraordinary liability which the law imposes is limited or restricted by the contract between the parties, so that this extraordinary liability, as a common carrier, did not commence until the property was actually loaded or taken for transportation; but the liability was that of a warehouseman until the transportation was actually commenced."

After charging the jury, in the same connection, that the bills of lading were not negotiable, so that any defence open to the plaintiff in error, if sued by Potter, might be made against the plaintiffs below, notwithstanding they had paid value for the property on the faith of the bill of lading, the court further said:

"But this rule must be taken with this qualification, that after the issuing of a bill of lading by the defendant as a warehouseman or common carrier no collusive agreement or conduct between the defendant and Potter can be allowed to prejudice the plaintiffs' rights as holders of these bills of lading. The plaintiffs have the right to have the contract performed substantially as it was made between Potter and the defendant. There can be no substantial change in the terms of the contract to the prejudice of the plaintiffs or any person to whom the contract or bill of lading may be assigned."

The court further charged the jury, that the defendant, as a common carrier, was not a guarantor of the quality of the commodity it assumed to transport, and added as follows:

"This rule may, however, be subjected to a qualification or limitation under the facts in this case as you may find them to be. The proof tends to show that Potter marked quite a large number of bales with the same grade and lot marks as those described in these bills of lading, and there is proof tending to show that no specific bales of cotton were set apart or considered as forming the particular bales to be shipped on these bills of lading, but it was understood between Potter and the defendant that out of the lot or quantity of bales marked in the manner designated in these bills of lading a sufficient number to make up what are called for by those bills of lading should be shipped. If you so find, then the defendant was bound to ship the number of bales called for by these bills of lading out of the larger quantity bearing the same common marks, and this would be the contract, if you find from the proof that the cotton in question was to be drawn from a larger lot bearing the same common marks.

"The testimony on the part of the defendant tends to show that the defendant's agents did not know at the time of the issuing of these bills of lading that the marks on these bales indicated the quality or the grade of the cotton; that, so far as Mr. O'Connor and the other agents of the defendant who had the responsible charge of the defendant's business at Texarkana were concerned, the marks only indicated a means of identification, and the quality of the cotton was not considered by them; that a bale of cotton to them was only a bale of cotton, without regard to quality; that in shipping the cotton in fulfilment of these bills of lading they only referred to the marks as a means of identifying or determining what cotton they were to ship under each bill of lading.

"As has been stated, the plaintiffs' proof tends to show that on or about the 9th of April the employes of Potter, with the knowledge of the defendant's agent, marked a lot of 800 bales of inferior cotton, then in the compress warehouse, with grade-marks corresponding to those called for by these bills of lad-

ing, and that the defendant shipped this inferior cotton to the plaintiffs in fulfilment of its contract under those bills of lading; while the defendant's proof tends to show that the defendant's agents had no knowledge of the fact that this cotton was of a quality inferior to that called for by these bills of lading, and had no knowledge of the fact that the grademarks on the bales so shipped had been changed from marks indicating a lower grade to those indicating the grade called for by the bills of lading, but that, on the contrary, they accepted the cotton with the belief that it was the cotton called for by the bills of lading, and which had been delayed in the warehouse up to that time for the purpose of compressing and getting it ready for shipment.

"4th. If the proof in the case satisfies you that the defendant's agents knew or were informed at the time they shipped this cotton to the plaintiffs or accepted it for shipment that it was of a quality inferior to that called for by the bills of lading which the defendant had issued for it, and knew that the marks on those bales or packages had been changed from marks indicating a lower grade or quality of cotton to marks indicating the grade called for by the bills of lading, then the defendant is liable in this action for the difference in value between the cotton of the quality called for by the bills of lading and the value of the cotton actually shipped — that is to say, if the proof satisfies you that the agent of the defendant connived at the substitution of a lower and inferior quality of cotton in place of that called for by the bills of lading, although the marks may have been such as called for by the bills of lading, then the defendant is liable. While, if from the proof you are satisfied that when the agents of the defendant actually shipped the cotton they had no knowledge of the difference in quality between the cotton so shipped and that called for by the bills of lading, and had no knowledge that the cotton was, in fact, inferior to that called for by the bills of lading, and that the grade-marks on the bales had been changed from marks indicating a lower grade to marks called for by the bills of lading, then the defendant is not liable.

"You are to determine, then, as a question of fact, from the testimony —

"First. Whether it was in the course of business in the handling of this cotton in the warehouse to set apart and keep separate the cotton covered by each bill of lading from the time such bill of lading was issued, or whether the defendant's agent, O'Connor, only satisfied himself, through the agency of Martin or his employes, that there was enough cotton, as stated in the bills of lading, to fill such bill as part of a common lot answering to the same description. As, for illustration, there might be in a railroad warehouse in this city, 10,000 barrels of flour of one brand, and ten bills of lading might be issued, each to a different person, calling each for 1000 barrels of this lot of flour. No one barrel would be specifically set apart as belonging to any one of these bills of lading; but any one of the 10,000 barrels would be liable to be shipped on any of these bills of lading — that is, it would be assumed that the entire lot was uniform and alike in quality, and it would, therefore, make no difference to the persons to whom it was shipped which particular barrel of flour he got. If such was the mode of doing business in this compress warehouse, and Potter understood it, then the defendant was not obliged to keep separate cotton called for by each bill of lading, but could fill the bill of lading out of the common lot bearing the same marks.

"Second. Did the agents of the defendant in charge of the issue of these bills of lading and the shipment of this cotton know the grade-marks of this cotton called for by the bills of lading; and did they know that this 525 bales in question was of an inferior grade to that called for by the bills of lading; and did they knowingly accept this inferior quality of cotton in place of that called for by the bills of lading, and ship the same to plaintiffs?

"As I have stated, a common carrier is not, as a rule, a guarantor of the quality of the goods transported, but it is bound to transport and deliver the identical goods covered by its contract, where such identity can be established, and, therefore, if at the time these bills of lading were issued it was not intended that they should cover any specific bales, but only a given number of bales, bearing certain common

marks, without regard to quality, as understood by the defendant's agents, and that the defendant did ship the number of bales called for by the bills of lading, and marked as required by the bills of lading, with no knowledge or information that the cotton contained in those bales was inferior to that called for by the bills of lading, then the defendant is not liable.

"But if you are satisfied, from the proof, that the agents of the defendant knew at the time they received and shipped the 525 bales in question that it was inferior in quality to that called for by the bills of lading, and that fraudulent or false grade-marks had been put upon these bales corresponding to the marks called for by the bills of lading, then the defendant is liable.

"The defendant having, as I have already stated to you, assumed the responsibility of a warehouseman in regard to this cotton while it was being compressed and prepared for shipment, was obliged to see to it that the cotton it had receipted for was kept on hand for shipment, and had no right, knowingly, to allow a lower grade of cotton to be substituted for that called for by the bills of lading."

The suggestion in the charge of the court of a possible ground of liability on the part of the defendant as a warehouseman was entirely outside of the issues. The defendant was not sued upon the ground of any such alleged liability. No facts and circumstances out of which any duty as warehouseman could arise were set out in the declaration; the action was upon the bills of lading alone. The contract alleged to have been made and broken was contained in them. The duty charged to have been violated was the duty of the defendant as a common carrier for an alleged negligence in the transportation of the goods. And if the defendant could be supposed, upon the facts proven, to have incurred liability in its character as warehouseman, as distinguished from its capacity as a carrier, that liability was not incurred in respect to the plaintiffs. It is not charged that the defendant, as a warehouseman, received any goods as their property for the purpose of storage and safekeeping. Its relation as a ware-

houseman was with Potter, and him alone. It was an error, therefore, in the court to charge the jury that the defendant might be charged in this action for the loss in question upon its responsibility as a warehouseman to the plaintiffs.

It may be contended, however, that in one possible view of the fact this error was not prejudicial to the defendant. It may be said that the defendant's liability as a common carrier commenced at a time antecedent to the delivery of the cotton to be loaded on the cars; that it might have arisen upon a prior delivery of the cotton in question in the warehouse to be compressed, and then transported, the duty of compressing it, in order to prepare it for transportation, having been undertaken by the defendant. This, however, could only be when the specific goods, as the property of the plaintiffs, were delivered for that purpose into the exclusive possession and control of the defendant. Such was not the case in the present instance. No specific bales of cotton, as the property of the plaintiffs, separate from all others, were delivered to the defendant for them until the 525 bales in controversy were set apart and delivered to the defendant for immediate transportation on its cars; and prior to that time all cotton received in the warehouse to be compressed was received as the property of Potter, on his account, and subject, so far as grading, classifying, and marking were concerned, to his control, and none of it could be considered as having passed into the possession of the defendant as a common carrier for transportation until designated and set apart by Potter or his agents. The cotton received at the compress warehouse came consigned to Potter upon bills of lading issued by other railroad and transportation companies at the point of shipment for delivery to him at Texarkana. Supposing, as one view of the evidence authorizes, the bills of lading were issued by the agents of the defendant to Potter in advance of the actual delivery of the cotton in the warehouse, on the faith of the bills of lading produced and surrendered by him given by other carriers, still the cotton, as it came and accumulated in the warehouse for the purpose of being compressed, continued to be the property of Potter, subject to his control in the re-

spects already mentioned, and until specific lots were marked and designated, so as to correspond with the bills of lading previously issued by the defendant, the latter had no possession of the property as a carrier. The undisputed facts are that the whole quantity of cotton purchased by Potter, and received on his account in the warehouse, did not answer the grades and descriptions according to which he had sold it to different purchasers. He was unable out of the cotton to perform all of these contracts. The whole number of bales received by him were sufficient in number, and they were all transported according to his directions. It is not claimed that any of them were converted to the use of the railroad company, or that any of them were delivered by the railroad company, after they were received for transportation, to any other than the proper consignees.

The court below, however, charged the jury that, notwithstanding "no specific bales of cotton were set apart or considered as forming the particular bales to be shipped on these bills of lading," if "it was understood between Potter and the defendant that, out of the lot or quantity of bales marked in the manner designated in these bills of lading, a sufficient number to make up what are called for by those bills of lading should be shipped," that "then the defendant was bound to ship the number of bales called for by these bills of lading out of the larger quantity bearing the same common marks," if the jury "find from the proof that the cotton in question was to be drawn from a larger lot bearing the same common marks."

This charge seems to assume that, during the progress of the receipt and accumulation of cotton for Potter in the warehouse, there was a sufficient number of bales of the proper grade and quality, and from time to time so marked, to satisfy the bills of lading sued on; and that it was, therefore, the duty of the defendant so to apply them; but it ignores the fact that they were actually applied to satisfy other bills of lading in the hands of parties equally entitled to call for them, and also the more important, because controlling, fact that they were thus applied by the order and direction of Potter, the

owner and consignor, who had the right so to direct. There was no relation established between the plaintiffs and the defendant, in respect to the cotton described in their bills of lading, out of which any duty or obligation could arise with respect to it on the part of the defendant until the specific lots of cotton intended for the plaintiffs had been separated and set apart by Potter, and by him delivered to the defendant for immediate transportation, according to the terms of the bills of lading.

The court also instructed the jury, as shown by the extracts from the charge already made, that if the agent of the defendant accepted the cotton in question for shipment, knowing at the time that it was of a quality inferior to that called for by the bills of lading which the defendant had issued for it, and the marks on the bales or packages had been changed from marks indicating a lower grade or quality of cotton to marks indicating the grade called for by the bills of lading, then the defendant was liable. This charge seems to have been given independently of any other circumstances than the mere fact of such knowledge. Possibly it was intended to be taken only in connection with the previous portion of the charge already considered, fixing upon the defendant the duty of selecting the specific quantity called for by these bills of lading out of any larger lot that may from time to time have been on hand in the warehouse answering the same description; and this instruction, therefore, may have been intended by the court as a qualification of what had been previously said. It stands, however, and may have been so understood by the jury, as a complete and separate statement of a distinct ground of liability. In either view, we think it erroneous. If intended as a qualification of the preceding instruction, it does not have the effect of correcting it in the particulars in which we have found it to be erroneous; standing by itself, we think it also to be erroneous. Taken, as it must be, in view of the undisputed facts, it would make it to have been the duty of the defendant, when the cotton in question was tendered by Potter for delivery to the railroad company to be carried under the terms of the bills of lading sued on, to have

refused the shipment altogether, on the ground that the goods offered did not correspond in grade and quality with those called for by the bills of lading. As we have already seen, the defendant undertook no such obligation in respect to these plaintiffs. The only alternative, if they did not receive them, would be to reject them altogether, and to refuse to carry them. In that event, upon the facts as they stood, the plaintiffs would have lost the whole 525 bales, instead of merely the difference between the value of those actually carried and those which Potter had agreed to deliver. For, on this supposition, Potter had no other cotton except this to deliver, and the case would have stood, as between the plaintiffs and the defendant, upon bills of lading where no property at all had been received by the carrier for transportation, bringing it exactly within the rule declared in *Pollard* v. *Vinton*, 105 U. S. 7.

It is argued, however, on the part of the defendants in error, that the defences made by the defendant below, based on the propositions we have considered, were not open to it on the pleadings. The only plea was the general issue of *non assumpsit*, not verified by an affidavit of its truth. The law of Illinois, as declared by statute, declares that " No person shall be permitted to deny on trial the execution or assignment of any instrument in writing, whether sealed or not, upon which any action may have been brought, or which shall be pleaded or set up by way of defence or set-off, or is admissible under the pleadings when a copy is filed, unless the person so denying the same shall, if defendant, verify his plea by affidavit." Hurd's Revised Statutes of Illinois, Practice Act, § 34. This statute regulates the practice and pleadings in similar cases in the Circuit Court of the United States for that district by virtue of § 914 of the Revised Statutes of the United States. This provision, however, is not applicable to the circumstances of this case. The execution of the bills of lading, which are the written instruments on which the action is founded, is not denied by anything set up on the part of the defendant below. Their existence and validity, so far as their form and terms are involved, are not in question. The only questions made and

decided are those which relate to their legal effect when considered with reference to the facts and circumstances of the case as disclosed in the evidence. The defence actually shown by them, so far as the present record is concerned, is not that the bills of lading were not valid and binding, but that the contract contained in them has been fully performed by the defendant.

In accordance with these views,

*The judgment of the Circuit Court is reversed, and the cause is remanded, with directions to grant a new trial.*