### THE KATE V. AITKIN.

### PINCKNEY v. THE KATE V. AITKIN.

*(District Court, D. South Carolina. June 28, 1889.)*

SHIPPING—BILL OF LADING.

Phosphate rock, as an article of export, is known to commerce as "wet" and "dry" rock, the latter being subjected to heat, and thereby made merchantable. Libelant sold a cargo of "dry" rock, which should contain not more than 2 per cent. of moisture, but after the rock was loaded, the master, representing the vendees and charterers, refused to sign a bill of lading for anything but simply "phosphate rock," while libelant insisted that he should sign for "dry phosphate rock," without qualification. On libel filed for damages for the master's refusal to sign, *held*, that both parties were in the wrong,—the libelant for insisting upon bills of lading for "dry rock" without qualification or explanation, and the master for refusing to sign except for phosphate rock without statement of its condition, wet or dry, as ascertainable by the senses,—and the libel was dismissed, and costs divided.

In Admiralty.

Libel for refusing to sign bill of lading.

*J. N. Nathans*, for libelant.

*J. P. K. Bryan*, for claimant.

SIMONTON, J. In order to understand this case a brief preface is necessary. Phosphate rock, as an article of export, is taken from the mine and subjected to the process of washing. When it leaves the washer, it is known as "wet" rock, and is shipped in that condition. Very frequently, however, the wet rock is dried before shipment. The drying process is either in a kiln or in the open air. The latter process exposes it to the action of the sun and air. The moisture is thus expelled.

In the kiln the rock is dried by artificial heat. After leaving the washer it is carried to the kiln, a brick structure, and is dumped on the floor. The rock being in nodules, falls naturally in conical form, the edges being near the walls of the kiln. When heat is applied the whole mass is affected, but, of course, the rock in the neighborhood of the center of the pile feels the full action of the heat. The nodules at the edges have less moisture expelled from them. When the fire is applied directly to the rock it shows the mark, and is dark. Rock dried in the sun and air is nearly white. All things being equal, the value of kiln-dried rock and rock dried in the sun and air is the same. The rock thus dried contains more or less moisture, varying from one-half per cent. up. What is known in commerce as "dry" rock must not contain more than 2 per cent. of moisture. More than 2 per cent. renders it unmerchantable. On 9th October, 1888, libelant contracted with Thomas & Son to sell them a cargo of best kiln-dried Magnolia rock, moisture not to exceed 2 per cent., at six dollars per long ton, delivered along-side buyers' vessel, at seller's works, on Ashley river. Terms, note at 60 days from date of bill of lading, with interest added at 6 per cent. per annum. Thomas & Son chartered the schooner Kate V. Aitkin, and sent her for the rock. The charter-party is in the usual form, and provides for a full cargo of "phosphate rock;" "the captain to sign bills of lading without prejudice to the charter-party." The schooner went to libelant's landing, and employed Mr. Cuthbert, the managing agent of libelant's mines, as her stevedore. Cuthbert began to load the schooner with rock out of a kiln near by and in sight. The rock was put into the lower hold. He then began to put in rock taken from a pile outside of the kiln. He says that this was sun-dried rock. The crew say that it was rock just from the washer,—wet rock. As soon as the mate saw this rock coming into the vessel, the master being absent, he stopped it, saying that it must not be mixed with the other rock. Cuthbert persisted. Finally he stopped work. When the master returned, he confirmed the action of the mate, and directed the outside rock to be put in between-decks. Cuthbert again persisted, and finally had his own way, the master saying that as Cuthbert persisted in mixing the rock he would not sign bills of lading for dry rock. Cuthbert had nothing to do with the bills of lading. About 50 tons of this outside rock were put in, and then the loading of the schooner was completed. The entire cargo was about 600 tons. When she came from the landing to the port of Charleston, Mr. Cohen, shipping agent of libelant, on 9th November, 1888, prepared and presented to the master bills of lading for a cargo of dry phosphate rock. The master refused to sign for dry phosphate rock, and tendered bills of lading for cargo "of phosphate rock." Neither side would yield or suggest or adopt amendment. The schooner being ready for sea, the libel was filed. It has been the practice in this trade to sign bills of lading for dry phosphate rock. In his bills libelant uses these words: The Aitkin has carried cargoes from his landing, and has given bills of lading in these words. The schooner sailed on 11th November, delivered cargo to Thomas & Son, which was found wet

in streaks on the starboard side, about one-third of cargo being so wet. She had encountered bad weather, and had been damaged by gales. Libelant drew on Thomas & Son for three-fourths of invoice price of cargo, 15 or 20 days after she left, and the draft was accepted. These are the essential facts. There is no doubt as to the jurisdiction. *The W. A. Morrell*, 27 Fed. Rep. 570; *Paterson v. Dakin*, 31 Fed. Rep. 682. It has not been questioned.

The evidence filed with this opinion shows that if all the rock had been taken from the kiln the master would have signed the bills of lading for dry phosphate rock. It is probable that if the rock had not been mixed he would have pursued the same course. Counsel, however, in presenting this case, have not directed their attention solely to the question whether the outside rock was phosphate rock dried by sun and air, or whether it was rock just out of the washer. On this point I have a clear opinion that it was not wet rock, and that Mr. Cuthbert's evidence settles the issue. But counsel have widened the question, and have discussed earnestly and learnedly the questions of strict right. Did libelant have the right to require the master to sign bills of lading for "dry phosphate rock?" Did the master have the right to refuse to sign except for "phosphate rock?" The words "dry phosphate rock" have two significations. In trade, as between buyer and seller, they mean phosphate rock, containing 2 per cent., or less, of moisture. When this fact is disputed it can be settled only by chemical analysis. But they have another, so to speak, a vulgar signification, in contradistinction to rock just from the washer, which is "wet" rock. The first has reference to its commercial qualities, to be definitely ascertained only by chemical analysis; the second, solely to its condition, observable by the senses. The master cannot be required to state in his bills of lading the precise chemical character of the cargo. He has no authority to do so. He has authority "to bind his owners with regard to the weight and condition and value of the goods. He has no authority to estimate and determine and state on the bill of lading the particular mercantile quality of the goods before they are put aboard; as, for instance, that they are goods containing such and such a percentage of good or bad material, or of such and such a season's growth. To ascertain such matters is obviously quite outside the scope of the functions and capacity of a ship's captain, and of the contract of carriage with which he has to do." *Cox v. Bruce*, L. R. 18 Q. B. Div. 147, quoted and followed in *Railway Co. v. Knight*, 122 U. S. 86, 7 Sup. Ct. Rep. 1132. So, when in this present case the master was called upon to sign bills of lading for dry phosphate rock, one meaning of which—a meaning used in the contract with his principal, the charterer of his vessel—was that it contained two per cent., or less, of moisture, he had the right to refuse to do so unless the expression was so qualified as to indicate the condition, and not, perchance, the chemical quality of the rock; especially so when, as the agent of the vendees, his charterers, he received the delivery under the contract of sale, and was thus, perhaps, in a position to bind them as to the chemical quality of the rock involved in the expression. But the libelant

also had his rights. He was fulfilling a contract to deliver to the buyer's vessel dry phosphate rock. The cargo was about to be transported by sea. It went in dry; that is to say, not moist, or wet. It was about to be exposed to wetting. Heavy rains might penetrate the deck. The hatches might be imperfectly or negligently battened down and protected. The sea-water could thus reach the cargo. Stress of weather might open her seams and let water in. The master himself might order or permit water to be put into the cargo, thus increasing its weight and his freight, payable on the result at the port of delivery. He had therefore the right to require the master to state on the bill of lading the condition of the cargo, (*Cox* v. *Bruce, supra,*) ascertainable by the senses; that is to say, either that it was not wet rock or that to all appearance it was dry,— neither damp nor wet to the eye or touch. The ordinary form of the bill of lading, "received in good order and condition," did not meet this if only the words "phosphate rock" were used. Phosphate rock direct from the washer, as we have seen, is used as cargo. This view is strengthened by another consideration. A carrier is not responsible if he safely delivers the very goods he actually received for transportation. *Railway Co.* v. *Knight, supra.* But in the carriage of phosphate rock such is the difference in the value of wet and dry rock (one dollar per ton) that it is important to the shipper to have from the carrier the acknowledgment, not only that he carries so many tons of phosphate rock, but also that it was in such a condition that the delivery of wet phosphate rock would not fulfill the contract. The master, therefore, had no right to refuse to sign bills of lading for anything else but phosphate rock. As is not unfrequently the case, both parties are in the wrong. Let each pay his own costs, and let them divide the costs of the officers of court between them.