## THE GUIDING STAR.

### WILBOUR v. HEGLER et al.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1894.)

#### No. 111.

1. CARRIERS—ACCEPTANCE OF GOODS—BILLS OF LADING.

The agent of a steamboat line signed a bill of lading for cotton as shipped "on board the good steamboat called ———, or any other boat in the employ of same line," the name of steamboat being left blank. *Held*, that the rights of parties under it were not affected by Act Miss. March 16, 1886, making "every bill of lading acknowledging the receipt" of goods conclusive evidence, in the hands of bona fide holders, that the goods were actually received for transportation, as there was no acknowledgment of the receipt of any cotton, or its shipment on any named boat.

**2. SAME.**

Another bill of lading, in the same form, had the blank for the name of the boat filled with an abbreviation of the name of the steamboat line. *Held,* that the statute did not make this conclusive evidence of the receipt of the cotton by a particular boat of the line, in the absence of evidence that such abbreviation was intended to designate that boat, or was so understood by either party.

**3. SHIPPING—BILLS OF LADING—AGENT OF STEAMBOAT LINE.**

Several steamboats, associated under the name of the S. T. Line, ran regularly between the same points under an agreement as to rates and sailing days, but each kept its own earnings, and paid its own expenses. The masters of all the boats executed a writing authorizing a person named to sign bills of lading, and to represent their boats, as agent. *Held,* that bills of lading signed by such agent could not bind all the boats jointly, and thus create a maritime lien against them all for each shipment, without regard to whether one or the other carried the goods, for the masters had no power to grant such authority. 53 Fed. 936, affirmed.

**4. SAME.**

In bills of lading executed by said agent for cotton shipped by such line from an intermediate landing, no steamboat was designated. The custom was that the first boat of the line coming after goods had been received for shipment should take them, unless already fully loaded. After issue of the bills of lading, and before any boat of the line arrived, the cotton was destroyed by fire. The next boat of the line passed without stopping. *Held,* that the bills of lading created no maritime lien on such boat for the destruction of the cotton. 53 Fed. 936, affirmed.

Appeal from the District Court of the United States for the Southern District of Ohio.

This was a libel by Henry F. Bennitt against the steamer Guiding Star (J. D. Hegler and others, claimants) for the loss of certain cotton. The district court dismissed the libel. 53 Fed. 936. Bennitt having deceased, the suit was continued by Joshua Wilbour, his executor, who appealed from the decree.

F. G. Roelker and Joseph Wilby, for appellant.

Ramsey, Maxwell & Ramsey and Stephens, Lincoln & Smith (Chas. H. Stephens, of counsel), for appellees.

Before TAFT and LURTON, Circuit Judges, and BARR, District Judge.

BARR, District Judge. This is an appeal from the district court for the southern district of Ohio, dismissing the appellant's libel.

This suit is a proceeding in rem to enforce a claim against the steamer Guiding Star for the sum of $17,351.94, the value of 238 bales of cotton which were burned at a landing on the Mississippi river, near Rosedale, in the state of Mississippi, in the early morning and during the day of January 26, 1890. This cotton was covered by two bills of lading, alleged to be the bills of lading of the Guiding Star, and dated January 15, 1890, and January 22, 1890, at Rosedale, Miss. The bill of lading dated January 15, 1890, is for 100 bales of cotton, and the other, dated January 22, 1890, is for 138 bales of cotton. These bills are on the forms used by a steamboat line called the Southern Transportation Line, and the Cincinnati, Hamilton & Dayton Railroad Company and its connecting railroad lines, and are signed by James Burke, agent. These forms provide for the delivery of the freight received by a steamer at Cincinnati,

Ohio, and then by the railroad companies to its destination. These bills of lading did not recite the receipt of the cotton on the Guiding Star, or any named steamboat, but in the one dated January 22, 1890, it was left blank, and in that dated January 15, 1890, it was filled "Sou. Trans. Co." The first part reads thus, viz.:

"Shipped in apparent good order and condition by W. P. McBath & Co. on account and risk of whom it may concern, on board the good steamboat called ————, or any other boat in the employ of same line, the following packages or articles, marked and numbered, which are to be delivered, without delay, in like order, at the port of Cincinnati, Ohio; unavoidable dangers of the river, collision, explosion, and fire excepted," etc.

The bill of lading dated January 15th is of like tenor, except, instead of a blank for name of steamboat, "Sou. Trans. Co." is used.

The bill of lading dated January 15, 1890, was indorsed by W. P. McBath & Co. and attached to a sight draft of same date drawn by them on H. F. Bennitt, Norwich, Conn., for $7,020.61; and the other bill of lading was indorsed and attached to a sight draft dated January 24, 1890, on the same party, for $10,092.48. Both drafts, with the bills of lading attached, were received by the bank of Rosedale, Miss., and were afterwards accepted and paid by Bennitt, appellant's testator.

H. F. Bennitt, in the original libel, claimed this cotton to have been bought on his order, and for his account, and that it was at the time of its delivery to the steamboat and its nondelivery his property, and claimed a maritime lien on the Guiding Star for the full value of the cotton covered by bills of lading, for its nondelivery. He alleged these bills of lading were signed, issued, and delivered by the duly-authorized agent of the Guiding Star and its owner, associated together in the business of transportation, under the name of the Southern Transportation Company.

The answer put in issue the material allegations of the libel, and, in addition, alleged this cotton was at or prior to January 25, 1890, taken to the steamboat landing by W. P. McBath & Co., and there delivered to the owner of the landing, with a view of shipment on some steamboat, and while lying at said landing, and in the custody of the owners or agents of McBath & Co., the cotton was totally destroyed by fire. The claimant also alleged that, if said bills of lading should be held to be the bills of lading of the Guiding Star, the provisions of these bills exempted the boat from liability for loss by fire.

Subsequently, the libelant filed an amended libel, in which he pleaded an act of the state of Mississippi entitled "An act to define the liability of persons and corporations issuing bills of lading and warehouse receipts," the first section of which is as follows:

"That every bill of lading or instrument in the nature or stead thereof, acknowledging the receipt of cotton or other things, shall be conclusive evidence in the hands of every bona fide holder, whether by assignment, pledge or otherwise, as against the person or corporation issuing the same, that the cotton or other things have been actually received for transportation."

The libelant alleged he was the bona fide holder of said bills of lading, and that said contracts were entered into in the state of Mississippi, and with reference to the laws of said state. He also alleged carelessness and negligence on the part of the boat and her

officers, in leaving this cotton at the landing, uncovered, unguarded, and unprotected, and that they had made no provision or security against fire, and had no means at hand to extinguish the fire, and that in consequence of which the cotton was lost.

The claimant answered this amended libel, and substantially made same defenses as in original answer, but did not notice the allegation as to negligence in not protecting cotton at the landing.

There are several errors assigned, but the material questions are whether or not these bills of lading are the Guiding Star's, and created a maritime lien on that boat, and, if so, whether, under the evidence, the boat is exempt, under the provision of the bills of lading, for this loss by fire.

It appears from the testimony that James Burke was in 1890, and for some years previous, the general freight agent of the Cincinnati, Hamilton & Dayton Railroad, and its connecting railroad lines, and had jurisdiction of a large extent of country, and that he was paid by said company for acting as freight agent. The authority which he had to act as agent of the Southern Transportation line in 1890 was in writing, and is as follows, omitting headings:

"Cincinnati, Ohio, Sept. 15th, 1889.

"Jas. Burke, Esqr., Greenville, Miss.—Dear Sir: You are hereby authorized to sign the joint bills of lading in use between the Southern Transportation line and the C., H. & D., and to represent our boats as agents for such business.

"Yours, truly,          O. P. Shinkle, Master Str. Golden Rule.
"Lem Kotes, Str. Mary Houston.
"J. D. Hegler, for Str. Guiding Star.
"S. C. McIntyre, for Str. Sherlock.
"J. S. Carter, Str. U. P. Schenck.

At this time, and subsequently, these steamboats ran regularly from Cincinnati to New Orleans, La., and from New Orleans to Cincinnati. These boats had an agreement by which rates were maintained, and regular days of sailing from Cincinnati and New Orleans were fixed; but each boat kept its own earnings, and paid its own expenses, and there was no interest in or connection with the earnings or expenses of one boat with that of any other boat of the line. The Southern Transportation Line was neither a corporation nor partnership, nor, indeed, an association of boats, except for the purpose indicated herein. It was however, the custom of the boats of this line, in making their respective trips, for the first one that came along to stop at intermediate ports or landings where freight was deposited for shipment, to take such freight, provided that boat was not already fully loaded; and it is proven that the Guiding Star was the first boat of this line expected at this landing, and did actually pass after the cotton described in the bills had been removed to the landing. This removal was on the 25th of January, and the Guiding Star passed up the night of the 27th of January.

Neither of these bills of lading was signed by James Burke, personally, but the one dated January 15th was signed "James Burke, Agent," by F. L. McGowan, his clerk, and the other with Burke's name, by Davis, who was the cashier of the bank of Rosedale, and

owner of the cotton yard where this cotton was stored. The right to sign these bills is claimed by verbal authority from Burke, but this is denied, as to Davis, by him. If we assume that Burke was the general agent of the Guiding Star in this matter, and could delegate the authority to these parties, and did so, the question arises as to the effect of the Mississippi statute.

The supreme court of that state has construed that act as not being merely a rule of evidence, but designed to change the character and legal effect of the contract, as evidenced by a bill of lading, or other instrument in the nature or stead thereof. Hazard v. Railroad Co., 67 Miss. 32, 7 South. 280. There is some difference in the definition of a "bill of lading," as given by different authorities. The definition given by Justice Clifford in the case of The Delaware, 14 Wall. 579, is:

"A written acknowledgment, signed by the master, that he has received the goods therein described from the shipper, to be transported, on the terms therein expressed, to the described place of destination, and there to be delivered to the consignee or parties therein designated."

The word "master," in this definition, will, of course, stand for any one authorized to bind the vessel or carrier. All of the definitions include and require an acknowledgment of the receipt of the goods or other article as part of the writing known as a "bill of lading." This is clearly required by the Mississippi act, else it can have no effect. It is the acknowledgment of the receipt of cotton or things which is made by this act conclusive evidence when the bill of lading, or other instrument of the nature or in the stead thereof, is in the hands of a bona fide holder. Neither of these bills of lading or instruments in writing acknowledges the receipt of this cotton by the Guiding Star.

A bill of lading in the usual form is a receipt for the goods or things shipped, and an agreement to carry and deliver the same as stipulated; and in the absence of any statute the receipt is merely prima facie evidence of the delivery of the goods, and may be modified and contradicted by parol evidence. But this statute, when it applies, was intended to change this, and make the acknowledgment of the receipt of the goods by the carrier to be conclusive evidence, if the bill of lading be in the hands of a bona fide holder. Whatever may be the right of a shipper or carrier, independently of a statute, to supply an omission in a bill of lading by parol evidence, or to change or contradict that part of the bill of lading which is a receipt for goods to be carried, that cannot be done when this statute is applied. The written acknowledgment must remain as it is written, and if there is no written acknowledgment of the receipt of the cotton or other things, then there is no acknowledgment to be made conclusive evidence under the statute.

There is no substantial difference in this respect between this act and the English act (18 & 19 Vict.). That act declares:

"Every bill of lading in the hands of a consignee or endorsee for valuable consideration representing goods to have been shipped on board a vessel shall be conclusive evidence of such shipment as against the master or other person signing same."

The act clearly contemplates the representation which is to be conclusive evidence is in writing, and a part of the bill of lading. The attention of the court is called by the learned counsel to the difference in the language of these acts, as to the persons against whom this representation or acknowledgment shall be conclusive evidence. The English act declares it "shall be conclusive * * * against the master or other person signing same;" and the Mississippi statute declares it "shall be conclusive evidence * * * against the person or corporation issuing same." It may be the latter act is somewhat broader in its terms than the English act; but this difference, if there be one, does not affect the present inquiry, —of whether or not the representation or acknowledgment must be in writing, and a part of the bill of lading.

If we are correct in our construction of this part of the Mississippi act, that act cannot affect the rights of the parties under the bill of lading dated January 22, 1890, as there is no acknowledgment of the receipt of any cotton, or its shipment on any named boat.

The next inquiry is whether and how the Mississippi act affects the rights of these litigants in regard to the cotton described in the bill of lading of January 15, 1890.

As we construe this act, it permits testimony to explain the words "Sou. Trans. Co." in this bill of lading, and also to show whose agent Burke was in this transaction, and his authority. It is unnecessary to decide whether "the person or corporation issuing the same," in the Mississippi act, includes persons and corporations who may indorse and deliver a bill of lading subsequent to its original signing and delivery. "Issuing," in this act, certainly means the person or corporation who signed the bill of lading, and first delivered it as a contract. In Jessel v. Bath, L. R. 2 Exch. 267, the court construed the English statute with strictness, and seemed to make the representations of a bill of lading conclusive evidence only against the person actually signing it. But in Brown v. Coal Co., L. R. 10 C. P. 568, one of the judges indicated an opinion that the statute was not confined to the person who actually signed a bill of lading, but would include a signing by an authorized agent. There can be no doubt that "Sou. Trans. Co." was an abbreviation of, and intended to be, "Southern Transportation Co."

Assuming this bill of lading is thus read, we must make inquiry as to the authority of Burke, and this necessitates a construction of the writing of September 15, 1889. That paper authorized Burke, as far as the signers could give the authority, to sign joint bills of lading then in use between the Southern Transportation line and the Cincinnati, Hamilton & Dayton road, and to represent the boats of the line as agent for such business. There is no evidence as to the form of the bills of lading then used, but we may presume the forms used in these bills of lading were the same as the form in September, 1889. This authority, read by the light of this form, must mean either that Burke was given authority to sign these joint bills of lading, and bind all of the

five boats of the line jointly, or that he was given authority to bind each boat of the line separately, as he might indicate in the bill of lading. Either construction of Burke's authority precludes libelant recovering under the claim of a maritime lien.

If the authority be to bind all of the boats of the line, and thus create a maritime lien against them all for each shipment, without regard to whether one or another boat carried the freight, then there was no power in the masters, or masters and part owners, of these boats to grant such authority to an agent.

If, on the other hand, Burke was given authority to bind these boats separately by a bill of lading, and an acknowledgment under the Mississippi statute, he has not done this in the bill of lading of January 15th. There is no evidence that, when this bill of lading was delivered to McBath & Co., "Sou. Trans. Co." was intended to designate the Guiding Star as the boat to receive this cotton, or that it had been Burke's previous habit or custom to thus designate the Guiding Star, nor is there any evidence to prove that there was any agreement with McBath & Co. to ship this cotton on the Guiding Star when the bill of lading was delivered to them, or indeed at any other time. The testimony touching this point is that it was the custom for the first passing boat of this line, if not fully loaded, to stop and take freight at intermediate ports and landings, and the Guiding Star was the first boat of this line to pass this landing after the cotton was removed to the landing under a guaranty given by T. F. Davis, cashier of the Bank of Rosedale. That guaranty is in these words:

"Rosedale, Miss., Jan. 22, 1890.

"We guaranty to deliver to the C., H. & D. R. R., or their agents, on bank of the Mississippi river, at People's landing, Rosedale, three hundred and nine bales cotton (309) within seven days, or return Bs of Ls for same. Cotton marked as follows:  O. L. D., 100; M. C. B., 21; H. O. X., 50; B. A. T. H., 138.

"T. F. Davis, C."

This cotton was delivered at the landing on the 25th of January, and was burned that night, and on the night of the 27th of January the Guiding Star passed up without stopping. It will be observed this delivery was to be to the Cincinnati, Hamilton & Dayton Railroad, or their agents, and was to be within seven days, or the bills of lading were to be returned. It happened this cotton was taken to the landing on the 25th of January; but if taken to the landing on the 28th or 29th of January, which would have been within the specified time, the Guiding Star would not have been the next boat of this line to arrive at this landing, and could not, of course, have taken this cotton on the night of the 27th of January. The guaranty was handed McGowan, and was taken by him, by the direction of Burke, from Davis, cashier of the Bank of Rosedale, who, from the face of the guaranty, had the bills of lading covering the cotton. If, therefore, the agreement or understanding was to ship this cotton on the Guiding Star, it is strange the guaranty was to deliver the cotton to the Cincinnati, Hamilton & Dayton Railroad Company, or its agents, and that seven days' time was given Davis within which to deliver

the cotton at landing. We conclude, as there is no evidence that "Sou. Trans. Co.," in this bill, was intended to designate the Guiding Star, or that it was so understood by either party, the acknowledgment of the receipt of this 100 bales of cotton in the bill of lading of January 15, 1890, is not conclusive evidence, under the statute, against the Guiding Star. If, however, the statute be applied against the shipper, this bill of lading is conclusive evidence in favor of the Guiding Star.

If the Mississippi statute be considered as not controlling the rights of the parties under these bills of lading, the inquiry arises, what is the liability of the Guiding Star under the general commercial and admiralty law?

Under these laws, parol evidence is allowed to explain, modify, and contradict the receipt part of a bill of lading. The letter of September 15, 1889, gave James Burke, as agent, authority to sign the bills of lading for the Cincinnati, Hamilton & Dayton Railroad and the boats of the Southern Transportation Line, and, as to a named boat and this railroad company, a joint bill of lading. Burke was already the general freight agent of the Cincinnati, Hamilton & Dayton Railroad Company; and this letter, we think, gave him authority to sign such bills of lading in the absence of the master or other officer of any of these boats, whose usual business it was to sign and deliver bills of lading. This authority thus given was limited by the authority which the master—and, in this instance, the master and part owner of the Guiding Star—could himself have exercised in the premises. It did not, however, give Burke authority to bind these boats jointly for cotton received for and shipped by one of them, nor to issue a general bill of lading for this transportation line, and thus make it the bill of lading for all of these boats. The cotton described in bill of lading dated January 15, 1890, was in the cotton yard of F. H. Davis when that bill was delivered to McBath & Co.'s agent, Smith. This bill does not, on its face, connect the Guiding Star with this cotton, more than it does any other of the four boats of this line. It is not proven that the Guiding Star was expected to be the next boat passing this landing, going north, after the date of the bill of lading. On the contrary, the presumption is, from the time intervening between the 15th and 27th of January, that the Guiding Star was not the next boat to arrive, or that did arrive, at that landing. There is no evidence that Mr. Burke or McGowan, who signed this bill of lading, agreed with McBath & Co., or any one representing that firm, that this 100 bales of cotton should be shipped on the Guiding Star. That is, we think, equally true of the cotton described in the bill of lading dated January 22, 1890. We do not find that any witness testifies that Burke, McGowan, or any one representing Burke, ever agreed with McBath & Co., or any one representing that firm, that the cotton described in the bill of lading dated January 22d should be shipped on the Guiding Star.

When the guaranty dated January 22, 1890, was received by McGowan, he testifies he delivered the cotton-yard receipts to

Davis, and accepted the guaranty of the Bank of Rosedale for all the cotton mentioned in it. This is Davis' evidence touching the agreement as to the delivery at the landing by him, viz.:

"Int. 2. Mr. Davis, you testified in a former deposition as to a guaranty given by you, as cashier, that the cotton would be delivered on the bank of the Mississippi river, at People's landing, to the C., H. & D. R. R., or their agents. Who was the agent to whom it was to be delivered? A. Well, I delivered it to them myself, as agent for them. They wanted Mr. McGowan, I think it was, I gave that guaranty to. McGowan wanted me, at first, to deliver the cotton to the boat. I told him I could not do anything like that, because the boat might not be here for three or four days, but that I would guaranty it delivered on the landing, where, of course, the landing keeper would be expected to take charge of it; he could write in the guaranty the C., H. & H., or rather, C., H. & D., which would include me. He said that would be all right, as all they wanted was to be certain that it would be delivered where their boats could handle it,—take it."

There is no other testimony tending to prove Mr. Davis was constituted the agent of Burke to receive this cotton at the landing, although both Burke's and McGowan's depositions were twice taken. The testimony of Davis himself and others clearly proves that he was not at the landing when this cotton was received there, nor had he a representative there, but that it was received, if by any one, by the agents of McBath & Co.,—the landing keepers. This statement of Davis proves no boat had been designated to take this cotton on January 22d, when the bill of lading was delivered and the guaranty given by Davis.

There is no evidence proving an intention to ship any of this cotton on the Guiding Star prior to its removal from the cotton yard of Davis, on January 25, 1890. At this time both bills of lading had been attached to sight drafts on Bennitt, and been sent forward for acceptance and payment. As the receipt and possession of this cotton at the landing are important, we quote upon this point the testimony of W. W. Smith and T. J. Ashby, both in the employ of McBath & Co., and all other witnesses who know anything about the matter:

"My name is W. W. Smith. 30 years of age. Resident Greenville, Miss. Occupation, cotton buyer. Employed by W. P. McBath & Co. in January, 1890. Int. 1. On the 25th day of January, 1890, did you have charge of 238 bales of cotton marked 'B. A. F. H.' and 'O. L. D.,' consigned to H. F. Bennitt, R. J., by W. P. McBath & Co.? A. I did. Int. 2. Where was the cotton on that day, and what was done with it? A. The cotton was in Davis & Co.'s cotton yard, in Rosedale, and transferred to People's landing, on the bank of Mississippi river. * * * Int. 4. Did you leave the cotton in charge of any one? A. I suppose it was in charge of the landing keeper. Int. 5. Who was the landing keeper? A. E. Carnes. Int. 6. Was he paid for the storage of the cotton? A. Yes; I paid him for the landing charges, etc. Int. 7. Was the steamboat Guiding Star there at the time? A. No, sir. Int. 8. Was the cotton merely left with the landing keeper as a warehouseman, whose charges you were to pay? A. When the cotton was deposited there, it was the understanding that I was to pay E. Carnes the charges on it. Int. 9. Did other steamboats besides the Guiding Star use this landing? A. Owing to the high water, it was then used for the landing for Rosedale. Int. 10. Was the cotton delivered to the steamboat Guiding Star? A. The cotton was delivered on the banks of the Mississippi river, as per contract, for shipment on the Guiding Star."

J. W. Ousler proves that he and E. Carnes were at the time in partnership in this landing, and that McBath & Co. paid the storage for this 238 bales of cotton.

Mr. Davis was asked on cross-examination by appellant's counsel:

"Int. 1. Did Mr. Burke instruct you to have the cotton delivered to any one in particular, on the landing, before issuing bills of lading, or merely to have it deposited there? A. He told me to issue bills of lading as soon as the cotton was hauled to the landing. Int. 2. Did Burke tell you by which steamer or line of steamers this cotton was to be shipped? A. He merely stated 'his line,' of which I do not know the name, or those of the individual boats."

T. J. Ashby stated he was in the employ of W. P. McBath & Co. in January, 1890, and was asked:

"Int. 3. What was done with this cotton? A. This cotton was transferred to the People's landing from Rosedale. Int. 4. Where were you when it was being transferred? A. I was at the landing receiving the cotton. Int. 5. What became of this cotton afterwards? A. It was burnt between 2 and 3 o'clock in the morning of the 26th. * * * Int. 10. Was the cotton simply placed on the ground? A. Yes, sir. Int. 11. Did you put it in charge of any one? A. No, sir; merely put in good shape, and supposed it was under bill of lading. * * * X-Int. 2. Did you exercise any control over it after placing it there? A. No; I went back to town, and had nothing more to do with it."

Although the depositions of Davis, McGowan, McBath, and Burke were taken, and some of them twice, none of them state any agreement to ship this cotton on the Guiding Star. The nearest to evidence of such an agreement is the statement of W. W. Smith, quoted above. McBath proves that he did not personally receive either of these bills of lading, but they were received by Smith; and we think his statement that this cotton was delivered on the banks of the Mississippi river, "as per contract for shipment on the Guiding Star," has, and can only have, reference to the bills of lading. There is no testimony of any other contract, or any evidence tending to prove any other.

When this cotton was removed from the cotton yard to the landing, neither Burke, nor any agent of his, was present, and there is no evidence that he, or any agent of his, knew of the removal until the next day, when they heard of the fire.

We conclude from the entire evidence that these bills of lading were not, in fact or law, delivered as the bills of lading of the Guiding Star, nor subsequently made so, and, further, that Burke, as agent, could not, under the existing facts, have legally given bills of lading to McBath & Co., so as to create a maritime lien on the Guiding Star for this cotton. See The Freeman v. Buckingham, 18 How. 182; Pollard v. Vinton, 105 U. S. 7; Railway Co. v. Knight, 122 U. S. 87, 7 Sup. Ct. 1132; Friedlander v. Railway Co., 130 U. S. 423, 9 Sup. Ct. 570; Grant v. Norway, 10 C. B. 665.

This view renders it unnecessary for the court to consider the other questions presented and argued.

The judgment of the district court is affirmed.