# ST. LOUIS, IRON MOUNTAIN AND SOUTHERN RAILWAY COMPANY *v.* COMMERCIAL UNION INSURANCE COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

No. 1169. Submitted December 15, 1890. — Decided March 16, 1891.

In the State of Arkansas, foreign insurance companies are governed by the statute of March 26, 1887, requiring such companies to file with the auditor of State stipulations for the service of process upon them, and not by the statute of April 4, 1887, which requires foreign corporations to file such stipulations with the Secretary of State.

The right of an insurer, upon paying for a total loss of the goods insured, to recover over against a third person responsible for the loss, is derived by way of subrogation from the assured, and can be enforced in his right only.

A railroad corporation, which has contracted with a compress company to receive and transport all cotton brought by its owners to the warehouse of that company, and neglects to do so, by reason of which, and of the consequent accumulation of cotton at the warehouse, so large a mass of cotton is piled and kept by the compress company in the adjoining street, as from the danger of taking fire to become a public nuisance, and is there destroyed by fire from an unknown cause, is not responsible for the loss to owners of part of such cotton for which it has given no bills of lading, if it has in fact assumed no custody or control of any of the cotton, or of the place where it was kept, before it was put upon the cars ; although it has, as a matter of convenience, given to the owners of other parts of such cotton bills of lading in exchange for the warehouse receipts of the compress company ; and although it is prohibited by statute, under a penalty, from issuing bills of lading, except for goods actually received into its possession.

This was an action at law, brought September 21, 1889, against a railroad corporation of Arkansas, by three insurance companies, corporations of other States or of England, to recover the sum of $17,000, which the plaintiffs had insured on 340 bales of cotton to Samuel O. Smith & Co., the owners thereof, and had paid to them upon a loss of the cotton by fire, in consequence (as the complaint alleged) of the defendant's negligence.

A plea of nonjoinder of Samuel O. Smith & Co. was filed and overruled, and the defendant answered to the merits.

The evidence introduced by the plaintiffs at the trial tended to prove the following facts:

Before September 20, 1887, the defendant (whose railway extended from Little Rock in Arkansas across the Arkansas River to Argenta and beyond) had made an oral contract with the Union Compress Company (which was engaged in compressing bales of cotton for transportation) to receive all cotton in bales that might be brought by its owners to the sheds of the compress company at the foot of Main Street in Little Rock, and to transport it over its railway across the Arkansas River to the compress of that company in Argenta, a distance of a mile and a half, for $2 a carload. Immediately in front of the sheds was a platform along the railway track, and habitually used by the compress company for the purpose of loading cotton on the cars.

While the contract was in force, 340 bales of uncompressed cotton were placed by Samuel O. Smith & Co. at the sheds and in the care and custody of the compress company, which gave them a receipt stating that the cotton was "received by the Union Compress Company for compression; storage after ten days will be charged; not responsible for any loss by fire;" and afterwards, by reason of an accumulation of cotton in the sheds, owing to the neglect of the defendant railway company, though often requested by the compress company, to furnish transportation according to the contract between them, the compress company piled and kept these bales and much more other cotton in the street adjoining.

The defendant railway company, as a matter of convenience

to all parties, and at the request of owners of cotton, often gave them, in exchange for the receipts of the compress company, and before the cotton was put on the cars by the latter, through bills of lading to its ultimate destination after being compressed; and, after so issuing such bills of lading, gave written notice to the compress company, stating the fact of their issue, and directing the compress company to ship the cotton on the railway by a certain route and to a certain address; and the compress company, on receiving such notice, insured the cotton in behalf of the railway company, and put the cotton on the cars, compressing it at Argenta for the convenience of further transportation.

The railway company gave such bills of lading for most of the other cotton; but it gave no bill of lading for the 340 bales in question; and, unless through its dealings with the compress company as aforesaid, it in fact exercised no custody or control of the sheds and the street, or of any of the cotton, before it was put on the cars by the compress company.

The plaintiffs, on October 17 and 19 and November 11, 1887, by their agents at Little Rock, without having complied with the provisions of the statute of Arkansas of April 4, 1887, c. 135, entitled "An act to prescribe the conditions upon which foreign corporations may do business in this State," severally issued policies of insurance to Smith & Co., amounting in all to $17,000, on the 340 bales of cotton, describing it as in the sheds, on the platform and in the street. The value of these bales was $18,179.

On November 14, 1887, the cotton piled in the street, including the 340 bales, was wholly destroyed by fire from an unknown cause; and the plaintiffs afterwards paid Smith & Co. the sums insured.

The defendant requested the court to give, among others, the following instructions to the jury:

"5th. If at the time said cotton was burned, on November 14, 1887, at the foot of Main Street, it was in the custody, possession and control of the Union Compress Company, and upon premises over which the defendant railway company had no control, and if it owed no duty as a common carrier in

relation to said cotton, and if, while in such custody and control, the cotton was set on fire by the act of some unknown person, with whom the defendant had no connection and of whom it had no knowledge, then the defendant railroad company cannot be held liable in this action."

"11th. If the jury find from the evidence that there was no contract or arrangement between the railway company and the compress company which contemplated the depositing of cotton in and upon Main Street, but that the placing of cotton there and the permitting of it to be placed there was the sole act of the compress company and the owners of the cotton, and that the railway company had no control over the premises where the cotton was stored, then the defendant is not liable in this suit, even though the depositing of cotton in and upon Main Street constituted a public nuisance.

"12th. In order to make the defendant liable for the placing of cotton in and upon Main Street, the jury must find from the evidence that the defendant was a party to the arrangement or agreement by which the cotton was deposited in and upon said street; and the mere fact that an arrangement existed by which the defendant issued bills of lading for cotton deposited in the compress warehouses and had agreed to handle the same from said warehouses to Argenta, this fact of itself will not make the defendant liable for an injury which would not have happened except for the placing of cotton on the street itself."

"14th. If the jury find that the plaintiffs, at the time of the issue of the policies of insurance introduced in evidence in this cause, had not and have never up to this date filed in the office of the Secretary of State certificates designating an agent upon whom service of summons and other process may be made, or certificates stating the principal place of business of each plaintiff in this State, as required by the statute of the State, it cannot maintain this action."

The court refused to give each of these instructions; and instructed the jury that, by the agreement between the defendant and the compress company, the defendant made the cotton sheds of that company a receiving station for cotton to

be sent by any one from Little Rock to the compress of that company at Argenta, and " it was the duty of said defendant to transport the cotton, thus received at said cotton sheds for shipment, promptly to Argenta; and that if the defendant failed to do so, and by reason of the continued reception of cotton at said sheds, and the continued giving of bills of lading therefor as often as demanded by shippers thereof, down to the day of the fire, cotton was suffered to accumulate at said sheds and on Main Street until it endangered the property of others in the immediate vicinity and that mentioned in the complaint, then the defendant was guilty of aiding in the creation and maintenance of a public nuisance, and is liable for the loss mentioned in the complaint;" and that if the jury found that "the defendant was guilty of aiding in erecting, maintaining or continuing said nuisance as aforesaid, and the cotton mentioned in said complaint was destroyed by reason thereof," and was at the time of the loss insured against fire by the plaintiffs, and the plaintiffs since that time and before bringing this suit paid the amount of the loss to the assured, the jury should return a verdict for the plaintiffs for the sums so paid, with interest.

The grounds of the rulings and instructions of the Circuit Court appear in its opinion delivered in a similar action brought against the same railway company by another insurance company, and reported as *Marine Ins. Co.* v. *St. Louis, Iron Mountain & Southern Railway*, 41 Fed. Rep. 643.

The defendant duly excepted to the refusal to give each of the instructions requested, and to so much of the instructions given as is above stated; and, after verdict and judgment for the plaintiffs, sued out this writ of error.

*Mr. John F. Dillon* and *Mr. Harry Hubbard* for plaintiff in error.

*Mr. U. M. Rose, Mr. E. W. Kimball*, and *Mr. G. B. Rose* for defendants in error.

I. The first assignment of error on the part of the appellant is to the effect that suit should have been brought in the

name of the insured. As to this point it is enough to say that it was never made in the court below; but, if Smith, the insured, was a necessary party, as contended for by counsel, nevertheless the omission to have him made a párty under the circumstances appearing in the record in this case, is not a reversible error.

The Arkansas Civil Code provides as follows: "The court must in every stage of an action disregard any error or defect in the proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect." Mansfield's Digest, sec. 5083; *Sannoner* v. *Jacobson*, 47 Arkansas, 31, 44.

The plain meaning of the statute is that the statutory rules of procedure — and there are no others — are directory only; mere means for the attainment of justice, and in no sense objects to which justice shall be sacrificed. *Washington* v. *Love*, 34 Arkansas, 93.

II. As to the claim that the plaintiffs could not maintain the suit because they were foreign insurance companies doing business in Arkansas. Counsel for plaintiff in error copy in their brief the statute of 1887, relating to foreign corporations. But, prior to that time, a counterpart of that act, specially applying to insurance companies, had been passed. By reference to Mansfield's Digest, §§ 3827, 3831, 3834, which codify the provisions contained in that statute, it will be seen that these sections are a part of a series of statutes relating to insurance companies, forming a code in itself, establishing an "insurance bureau," and governing matters of insurance generally. The sections above quoted had the same effect as to insurance companies that the later act had upon other foreign corporations. They differ in respect of the particular that in the case of foreign insurance companies the stipulation should be filed in the office of the Auditor, while in the case of other foreign corporations it was to be filed in the office of the Secretary of State.

III. As to the negligence of the defendant. The evidence, without conflict, showed that the defendant had the only line

of railway running from the foot of Main Street to the compress in Argenta; that it made a contract with the compress company to transport all cotton received to the compress in Argenta at the price of $2 per load; that the defendant was to send the cars as they were needed; that it was called on by the compress company to furnish cars to remove the arriving cotton; that it failed to do so; that cotton lay at the foot of Main Street, much of it under bills of lading, during very dry weather, for from seven to twenty days, when the fire took place, burning from 3500 to 4000 bales in and around the sheds of the compress company and in the street, of which cotton bills of lading had been given by the defendant for more than 1400 bales.

Counsel insist that the station of the railway company at the foot of Main Street was not a receiving station, but no reason for arriving at such a conclusion is suggested. It was a place where every one took his cotton for shipment if he wished to do so. As virtually all cotton is compressed in the present day before shipment to market, the incidental compression of cotton on the way, did not in any manner affect the fact that the station was not only a station of the defendant, but a general station.

The number of bales that were received there within a short period, shows that it was not only a receiving station, but that it was a receiving station for a very large amount of cotton.

This was then practically the only shipping station for cotton in the city that defendant had at that time. It had agreed with the compress company that it would ship all cotton that should be received there to the compress in Argenta. The contract was in full force and unrescinded up to the time that the fire occurred. This was simply a shipping contract, made by a common carrier in the ordinary course of business. The fact that the compress company expected to compress the cotton after it was delivered in Argenta, cuts no figure in the case.

It is true that the compress company, acting as agent of defendant, did not issue bills of lading for cotton thus transported; but that was because bills were issued by another agent to the owners for the transit from Little Rock to Ar-

genta, and beyond; and as between the compress company and defendant the standing agreement was the equivalent of a bill of lading. Moreover, the compress company was paid for performing what service it did perform for the defendant in and about the transportation of the cotton. It was to load the cars for the defendant. Necessarily it could not load the cotton without receiving it. As the contract covered the entire operation of receiving, loading and transportation, the consideration agreed on must be regarded as having relation to every part of the service performed and received. The cotton would not have accumulated if the defendant had performed its duty, and hence it is liable. *Little Rock Railroad Co.* v. *Dick*, 52 Arkansas, 402; *Jones* v. *Norris*, 46 Arkansas, 207; *Denver & South Park Railroad Co.* v. *Conway*, 8 Colorado, 1; *Scott* v. *Hunter*, 46 Penn. St. 192; *S. C.* 84 Am. Dec. 542.

The creator of a nuisance, or one who more remotely, either by negligence or design, furnishes means and facilities for the commission of any injury to another, which could not have been done without them, is equally responsible with the wrongdoer. *Anderson* v. *Dickie*, 26 How. Pr. 105. See also *Rogers* v. *Stewart*, 5 Vermont, 215; *S. C.* 26 Am. Dec. 296; *Scott* v. *Hunter*, 46 Penn. St. 192; *S. C.* 84 Am. Dec. 542; *Lake* v. *Milliken*, 62 Maine, 240; *Barrett* v. *Third Avenue Railroad Co.*, 45 N. Y. 628; *Slater* v. *Mersereau*, 64 N. Y. 138; *Davenport* v. *Ruckman*, 37 N. Y. 568; *Wasmer* v. *Delaware & Lackawanna Railroad Co.*, 80 N. Y. 212; *Linnehan* v. *Rollins*, 137 Mass. 123; *Ingwersen* v. *Rankin*, 47 N. J. Law (18 Vroom), 18; *King* v. *Pedly*, 1 Ad. & El. 822; *Henry* v. *Dennis*, 93 Indiana, 452; *Bonnell* v. *Smith*, 53 Iowa, 281; *Myers* v. *Malcom*, 6 Hill, 292; *S. C.* 41 Am. Dec. 744; *Salisbury* v. *Herchenroder*, 106 Mass. 458.

Ordinarily the cases on this subject present the feature of negligence on the part of the agent unknown and unsanctioned by the principal. In such cases the principal and the third person injured are, morally speaking, equally innocent, and the law fixes liability on the former because he had the selection of the agent. Such is not the case here. As for the fault of not removing the cotton promptly from its dangerous

locality, the defendant was solely to blame.   As to the manner in which the cotton was kept while it was waiting for transportation, the want of protection against the ever-impending danger of fire, its continuous and reckless exposure, the defendant was as guilty as its agent.   Being a corporation it could only act through agents, and it was as much bound for what was done by the compress company within the scope of its authority as it was for what was done by its conductors, train dispatchers and engine drivers within the scope of theirs.

If it were assumed that it was negligence in the compress company to let the cotton accumulate as it did, and to cause it to be piled in a public street, the result was confessedly, and by all the authorities, a nuisance "of a very alarming character."   What, then, was the duty of the compress company, supposing it to have suddenly become aware of the danger that had been incurred by its improper conduct?   Clearly there could not have been any building erected on the spot within a reasonable time for the safe storage of the cotton. The only practical remedy, easy, prompt and inexpensive, was to remove it from a place where it was exposed constantly to dangers seen and unseen.

Now the compress company had a standing contract with the defendant to do this very thing.   Supposing that the owners of the cotton had sued that company for the loss of their cotton, no possible doubt can exist, according to law and the theory of the defence in this case, but that the latter would have been held liable.   In the present case, the plaintiffs are entitled to the same right of action against the defendant that the compress company would have had in the case mentioned.   Concerning this proposition, no shadow of doubt exists, as a brief. glance at the authorities will show.   *Water Co.* v. *Ware*, 16 Wall. 566, 575 ; *Milford* v. *Holbrook*, 9 Allen, 17; *S. C.* 85 Am. Dec. 735; *Bean* v. *Green*, 4 Cush. 279 ; *Woburn* v. *Boston & Lowell Railroad*, 109 Mass. 283.

MR. JUSTICE GRAY, after stating the case as above, delivered the opinion of the court.

At the very foundation of this action lies the objection of the defendant that the plaintiffs could not acquire or enforce any rights under or by virtue of the contracts of insurance made by them within the State of Arkansas, because they had not complied with the statute of Arkansas of April 4, 1887, c. 135, entitled " An act to prescribe the conditions upon which foreign corporations may do business in this State," and containing the following provisions:

" SEC. 1. Before any foreign corporation shall begin to carry on business in this State, it shall, by its certificate under the hand of the president and seal of such company, filed in the office of the Secretary of State, designate an agent who shall be a citizen of this State, upon whom service, summons and other process may be made. Such certificate shall also state the principal place of business of such corporations in this State. Service upon such agent shall be sufficient to give jurisdiction over such corporation to any of the courts of this State.

" SEC. 2. If any such foreign corporation shall fail to comply with the provisions of the foregoing section, all its contracts with citizens of this State shall be void as to the corporation, and no court of this State shall enforce the same in favor of the corporation."

But a comparison of that statute with other legislation of the State of Arkansas clearly shows that it was not intended to include foreign insurance companies.

That statute was the earliest one of the kind in Arkansas, concerning foreign corporations generally. But a counterpart of that statute, (embodied in Mansfield's Digest, c. 83,) concerning foreign insurance companies, had for years been in force, which, after establishing an "insurance bureau" in the office of the auditor of state, and making it the duty of the auditor to see that all the laws of the State respecting insurance companies were faithfully executed; declaring it to be unlawful for any person, company or corporation to solicit or make any contract of insurance within the State without complying with the provisions of this act; and requiring every insurance company or association, domestic or foreign, doing

business in the State, to transmit to the auditor, annually, or oftener if requested, statements of its condition, business and receipts; provided as follows:

"SEC. 3831. No person shall act as agent or solicitor in this State of any insurance company of another State or foreign government, in any manner whatever relating to risks, until the provisions of this act have been complied with on the part of the company or association, and there has been granted to said company or association by the auditor a certificate of authority, showing that the company or association is authorized to transact business in this State."

"SEC. 3834. No insurance company not of this State, nor its agents, shall do business in this State, until it has filed with the auditor of this State a written stipulation, duly authenticated by the company, agreeing that any legal process affecting the company, served on the auditor or the party designated by him, or the agent specified by said company to receive service of process for the company, shall have the same effect as if served personally on the company within this State."

This statute also provided, by §§ 3832, 3833, that such companies should report to the auditor annually the amount of premiums received within the State, and certify to the auditor the names of "the agents appointed by them to solicit risks, issue policies or receive applications in this State," and that no such agent should transact business until he had procured a certificate from the auditor; and, by § 3835, that any foreign insurance company, or any person or corporation transacting business for it, without being authorized under this act, should be fined $500 a month, and be prohibited from doing business in the State until the fines were paid.

On March 26, 1887, only nine days before the passage of the statute concerning foreign corporations on which the defendant relies, the same legislature passed an act "for the better regulation of the business of insurance in this State," (Stat. 1887, c. 84,) containing the following provisions:

"SEC. 3. Before any corporation or company organized under the laws of any other State shall be permitted to do business in this State, they shall, in addition to filing the bond required

in section one of this act, be required to file with the auditor of state a statement of the commissioner of insurance of the State under whose laws they are organized, as to their condition, responsibility, etc., and if there be no such commissioner, the auditor may require said company to exhibit to him a statement of their financial condition, responsibility, etc., and if it appears that said company is a responsible company, said auditor shall issue a certificate to them, as hereinafter provided.

" Sec. 4. When any insurance company shall have complied with all the provisions of this act, it shall be the duty of the auditor of state to issue to said company a certificate to that effect, which shall entitle them to do business in this State; and if any person shall attempt to solicit or transact any business for and in the name of any such company, which company has not complied in all respects with the requirements of this act, he shall be guilty of a misdemeanor," and be fined not exceeding $500.

It thus appears that the State of Arkansas had established and maintained a distinct system with regard to foreign insurance companies, under the superintendence of the state auditor, by which every such company was required to file with the auditor a stipulation for the service of process upon it, as well as to make full returns of its condition and business to that officer, to report to him the names of all its agents within the State, and to receive from him certificates of authority for itself and for each of its agents; evidently contemplating that a foreign insurance company would have no principal place of business within the State, but would transact its business in the usual manner through agents at different places.

Such being the settled policy of the State with regard to foreign insurance companies, they cannot reasonably be held to be governed by the act concerning foreign corporations generally, which required a certificate to be filed with the Secretary of State, designating an agent upon whom service might be made, and stating the principal place of business of the corporation within the State. To construe that act as including foreign insurance companies would require the drawing of one of two equally improbable inferences; either that

the only stipulations of such companies for service of process upon them should be filed in a different public office from that in which all other returns and documents relating to such corporations are preserved; or else that their stipulations for such service must be filed both with the auditor and with the Secretary of State.

For these reasons, we are satisfied that the omission of the plaintiffs to file in the office of the Secretary of State the certificates required by the statute of Arkansas of April 4, 1887, c. 135, was no bar to this action; and that the fourteenth instruction requested was rightly refused.

It is not contended that the plaintiffs' contracts were void for want of compliance with the provisions of the statutes of Arkansas concerning foreign insurance companies, and it does not even appear whether they had or had not complied with them.

The validity of the contracts of insurance being established, there can be no doubt of the nature and extent of the rights acquired by the plaintiffs under those contracts.

In fire insurance, as in marine insurance, the insurer, upon paying to the assured the amount of a loss of the property insured, is doubtless subrogated in a corresponding amount to the assured's right of action against any other person responsible for the loss. But the right of the insurer against such other person does not rest upon any relation of contract or of privity between them. It arises out of the nature of the contract of insurance as a contract of indemnity, and is derived from the assured alone, and can be enforced in his right only. By the strict rules of the common law, it must be asserted in the name of the assured; in a court of equity or of admiralty, or under some state codes, it may be asserted by the insurer in his own name; but in any form of remedy the insurer can take nothing by subrogation but the rights of the assured; and if the assured has no right of action, none passes to the insurer. *Hall* v. *Railroad Cos.*, 13 Wall. 367, 370, 372; *Mobile & Montgomery Railway* v. *Jurey*, 111 U. S. 584, 593; *Phœnix Ins. Co.* v. *Erie Transportation Co.*, 117 U. S. 312, 321; *Liverpool & Great Western Co.* v. *Phenix Ins. Co.*, 129.

U. S. 397, 462; *Connecticut Ins. Co.* v. *Erie Railway*, 73 N. Y. 399; *Platt* v. *Richmond &c. Railroad*, 108 N. Y. 358.

The principal question in the case, therefore, is whether Samuel O. Smith & Co., the owners of the 340 bales of cotton, had any right of action against the defendant railway company for the loss of this cotton by fire.

As sufficiently appears by the bill of exceptions in this case, and more fully by an opinion delivered by the court below in the similar case of *Marine Ins. Co.* v. *St. Louis, Iron Mountain & Southern Railway*, 41 Fed. Rep. 643, 651, 652, the rulings and instructions under which the plaintiffs obtained a verdict proceeded upon the theory that, if the cotton had been suffered to accumulate in the sheds and in the street until, by reason of the danger of its taking fire, it endangered the property of the plaintiffs and others in the immediate vicinity, it was a public nuisance, and the defendant, as matter of law, was guilty of aiding in creating and maintaining that nuisance, and responsible for its consequences, upon three grounds: 1st. That the defendant had not removed the cotton as soon as delivered by the owners to the compress company, as it was authorized and required to do by its contract with that company. 2d. That the defendant must be conclusively presumed to have been in possession of so much of the cotton as it had issued bills of lading for. 3d. That the defendant had made the cotton sheds a receiving station for its railroad, and the compress company its agent to receive and hold the cotton.

The leading facts which the evidence introduced by the plaintiff at the trial tended to prove were as follows:

The defendant railway company had made an oral agreement with the compress company to receive and transport all cotton in bales brought by its owners to the sheds of the compress company; and broke this agreement by neglecting to furnish transportation. For most of the cotton delivered by its owners to the compress company, the railway company had issued bills of lading; but it had issued none for the 340 bales of Smith & Co. By reason of this neglect of the railway company to furnish transportation, and the consequent accumulation of cotton in the sheds of the compress company, a large

mass of cotton delivered by its owners to the compress company, including the 340 bales, was piled and kept by that company in a public street adjoining its sheds, and, while there, was destroyed by fire from an unknown cause.

So far as concerned the 340 bales, the only contract of the railway company was with the compress company, and was to receive and transport the cotton. The neglect of the railway company to furnish sufficient transportation may have been a breach of that contract, for which the compress company might maintain an action; but it created no liability, in contract or in tort, to the owners or insurers of the cotton, or to any other person. This cotton, certainly, was in the exclusive possession and control of the compress company. The railway company had not assumed the liability of a common carrier, or even of a warehouseman, with regard to it; had given no bills of lading for it; had no custody or control of it, and no possession of it, actual or constructive; and had no hand in placing or keeping it where it was. The delay of the defendant railway company to furnish transportation according to its contract with the compress company was in no legal sense a cause of the destruction of the cotton. It was simply one of a series of antecedent events without which the loss could not have happened, for, if the cotton had not been there, it would not have been burned. The cause of the loss was the fire, kindled by some unknown means, and in no way arising from or connected with the neglect of the defendant to furnish transportation. Upon principle and authority, that neglect was not the direct and proximate cause of the loss by fire, and did not make the defendant responsible for that loss to the owners of the cotton or to their insurers. *Railroad Co.* v. *Reeves*, 10 Wall. 176; *Morrison* v. *Davis*, 20 Penn. St. 171; *Denny* v. *New York Central Railroad*, 13 Gray, 481; *Hoadley* v. *Northern Transportation Co.*, 115 Mass. 304; *Dubuque Association* v. *Dubuque*, 30 Iowa, 176; *Daniels* v. *Ballantine*, 23 Ohio St. 532.

The next question is how far the railway company's liability in this action is affected by the fact that it had issued bills of lading for other cotton forming part of the same mass accumulated in the street.

The course of business was this : The compress company received the cotton from its owners, gave them warehouse receipts for it, and placed and kept it, as it saw fit, in its sheds or in the adjoining street. The railway company, whenever the owners requested, gave them bills of lading in exchange for the receipts of the compress company. After doing this, the railway company gave notice to the compress company, and directed that company to put the cotton on the cars addressed accordingly; and the compress company then insured the cotton in behalf of the railway company, and put the cotton on the cars.

There is nothing else in the case, which has any tendency to show that the railway company had or exercised any control or custody of the cotton, or of the place where it was kept by the compress company, before it was put upon the cars by that company. The railway company evidently neither considered itself, nor was considered by the compress company, as having assumed any responsibility for the care or custody of the cotton, until it had been insured in its behalf and loaded upon its cars. The evidence warranted, if it did not require, the inference that the bills of lading were issued merely for the convenience of all parties, and with no intention of making any change in the actual or the legal custody of the cotton until it was so loaded. *California Ins. Co.* v. *Union Compress Co.*, 133 U. S. 387, 415.

Upon the facts of this case, it may well be doubted whether the liability of the railway company as a common carrier began before the cotton had been received upon its cars, and had thereby come into its actual and exclusive possession and control. *St. Louis, Iron Mountain & Southern Railway* v. *Knight*, 122 U. S. 79, 93, 95. But, however that may be, the court below clearly went too far in instructing the jury that the railway company, merely by giving bills of lading for the cotton, became responsible for a nuisance resulting from the manner and the place in which the cotton was kept by the compress company.

It was suggested that, because by the statute of Arkansas of March 15, 1887, c. 60, all warehousemen and carriers were

prohibited, under a penalty, from issuing receipts or bills of lading, except for goods which had been actually received into their possession, the railway company must be conclusively presumed to have been in possession of the cotton for which it had issued bills of lading. But it might be argued, with equal force, that this statute prevented the bills of lading from binding the railway company before the cotton was actually received into its possession. If the statute has any bearing, it is only upon the question of fact whether the railway company had or had not any share in the custody and control of the cotton, for which bills of lading had been issued, before it was put upon the cars.

As to the hypothesis that the sheds of the compress company and the adjoining street had been made by the railway company one of its receiving stations, and that the compress company was the agent of the railway company, either in receiving or in holding the cotton, it is enough to say that, if the facts have any tendency to support that hypothesis, they fall far short of conclusively establishing it as matter of law.

The Circuit Court therefore erred in refusing to give the fifth, eleventh and twelfth instructions requested, as well as in the instructions which were given to the jury.

As for this reason the verdict must be set aside and a new trial ordered, at which an amendment in respect to parties may be allowed in the discretion of the court below, we express no opinion upon the question of pleading under the Code of Arkansas, (which is not free from doubt,) whether this action was rightly brought in the name of the insurance companies alone, or whether the assured should have been made a party, either as a plaintiff or as a defendant. See Mansfield's Digest, §§ 473, 4933, 4934; *St. Louis, Iron Mountain & Southern Railway* v. *Camden Bank,* 47 Arkansas, 541, 548.

> *Judgment reversed, and case remanded, with directions to set aside the verdict and to order a new trial.*

Mr. JUSTICE BROWN, not having been a member of the court when this case was argued, took no part in its decision.