THOMAS et al. v. WABASH, ST. L. & P. RY. CO. et al. (LANCASTER MILLS OF CLINTON, Intervener).

(Circuit Court, S. D. Illinois. September 24, 1894.)

1. CONFLICT OF LAWS—LIMITING LIABILITY OF CARRIERS.

St. Ill. March 27, 1874, provides that, whenever any property is received by a carrier to be transported from one place to another within or without the state, the carrier cannot limit his common-law liability safely to deliver such property by any stipulation in the receipt given for such property. *Held*, not to affect a contract made in Tennessee for the through shipment of cotton to Massachusetts, although the charter of the carrier so contracting was granted in Illinois.

2. CARRIERS—LIMITING LIABILITY.

A carrier cannot limit his common-law liability to the extent of exemption from loss of goods intrusted to him for transportation, and injured or destroyed through his own negligence.

3. SAME—NEGLIGENCE—LOSS OF FREIGHT.

When cotton is delivered to a carrier for shipment, and, after transportation for part of the distance, is left on a barge, constantly exposed to fire from boats and engines, for 18 days, the delay and exposure constitute such negligence as to render the carrier liable for the loss.

4. SAME—DELAY IN TRANSPORTATION.

A carrier is bound to know, when he accepts property for shipment, that he has or can obtain facilities for its transportation within a reasonable time.

5. SAME—REBATE TO SHIPPER.

Where the evidence was conflicting as to whether money paid by the carrier to the shipper was the consideration for the assumption by the shipper of all risk by fire or a rebate to obtain the shipment, the presumption that it was for the customary rebate controls.

Petition by the Lancaster Mills of Clinton, Mass., for the use of the Insurance Company of North America, against Anthony J. Thomas and Charles E. Tracy, receivers of the Cairo Division of the Wabash, St. Louis & Pacific Railway Company.

John F. Lewis and Curtis Tilton (W. L. Gross, of counsel), for petitioner.

John M. Butler, for Thomas and Tracy, receivers.

ALLEN, District Judge. The proceedings in this cause were commenced by the Insurance Company of North America to recover from the Cairo, Vincennes & Chicago Line, in the hands of Thomas and Tracy, its receivers, the invoice value of 700 bales of cotton destroyed by fire at Cairo, Ill., on the 28th day of December, 1886. The cotton was insured under the provisions of a general policy, in February, 1886, in favor of the Lancaster Mills, and the petitioners, having paid the loss, claim to have been subrogated to the rights of the assured, and seek a recovery against the carrier. Bowles & Son, of Memphis, Tenn., seem to have bought the cotton for, or as agents of, the Lancaster Mills, had the same sent to a compress company

in that city, and afterwards it was delivered by such agents of the Lancaster Mills to Joseph Nash, agent of the Cairo, Vincennes & Chicago Line, who gave in return bills of lading. The bill of lading covering the cotton on barge 49, acknowledged its receipt from Bowles & Son at Memphis, and has on its face the words, "Notify Lancaster Mills, Clinton, Massachusetts." It is a through bill, issued by the "Cairo, Vincennes & Chicago Line, in connection with all trunk lines between Cairo, Toledo, Cleveland, Detroit, Chicago, Buffalo, Pittsburgh, Philadelphia, Boston, New York, New England, and intermediate points," and undertook the carriage of the cotton from Memphis to Clinton, Mass. It is signed by Joseph Nash, agent of the Cairo, Vincennes & Chicago Line, and contains a clause exempting the carrier from liability "for loss or damage to any article or property whatever, by fire or other casualty, while in transit, or while in depots or other places of transshipment, or at depots or landings at point of delivery; nor for loss or damage by fire, collision, or the dangers of navigation while on the seas, rivers, lakes, or canals." It bears date, on its face, December 13, 1886, but there is evidently an error as to this date, as barge 49, with the 700 bales of cotton subsequently burned, reached Cairo about midnight of December 10th. The bill of lading was probably made on or about the 8th of December. The petition is answered by the receivers of the railroad carrier, and raises numerous questions of fact and of law pertaining to the alleged right of recovery. Much evidence has been taken, and great zeal and ability have been exhibited by counsel on both sides. Many of the issues of fact made by the answer, and questions of law discussed, have ceased to be important, much less controlling, in view of the character of the evidence and the presentation of authorities bearing upon them. No question is made as to the fact that the insurance company paid the Lancaster Mills the amount of the indemnity agreed on between them, nor of law that, having made such payment, it has the same right to recover the insured would have possessed had no payment or subrogation occurred.

One of the first questions presented is made by the denial on the part of petitioners of the validity of the fire exemption clause in the bill of lading, on account of the force of an Illinois statute passed March 27, 1874, which provides "that whenever any property is received by a common carrier to be transported from one place to another within or without this state, it shall not be lawful for such carrier to limit his common law liability safely to deliver such property at the place to which the same is to be transported, by any stipulation or limitation expressed in the receipt given for such property." When it is remembered that the bill of lading was executed, delivered, and accepted at Memphis, Tenn., that it contemplated a through carriage of cotton from Tennessee to Massachusetts, and that the power of the carrier to make such contract has not been challenged, the authority of the state of Illinois to declare invalid a clause in the contract cannot be admitted. The legislature of Illinois, in regulating commercial contracts, cannot, in binding effect, go beyond the boundaries of the state; and it does

not matter, in this regard, that the franchise to the corporation represented by the receivers, Thomas and Tracy, was granted by the Illinois legislature. They had the same rights at Memphis, or in any other place outside the boundaries of Illinois, to limit their common-law liabilities, that were possessed or belonged .to any other contracting party, natural or artificial. It may be assumed, then, that the carrier had the right to limit his common-law liability, but this privilege cannot be held to extend to loss of goods, intrusted to him for carriage, caused by his own carelessness or negligence. Counsel for receivers make no such contention. The intervening petition in this case alleges "that the loss of cotton by said fire was the result of the carelessness and negligence and delay of said receivers of said Cairo, Vincennes & Chicago Line while the said cotton was in their possession in course of transportation in pursuance of the contract of transportation aforesaid." Under the contract of affreightment, evidenced by the bill of lading, the Cairo, Vincennes & Chicago Line had the privilege of selecting its own line of transportation. It made choice of the Mississippi Valley Transportation Company from Memphis to Cairo. The barge containing the cotton left Memphis on the 8th or 9th of December, 1886, and was in the city of Cairo about midnight of the 10th of December. The undertaking bound the carrier to safely carry and deliver the cotton to the consignee within a reasonable time. I cannot, after the best consideration I have been enabled to give the evidence, resist the conclusion that the cotton was unreasonably detained at Cairo. Reaching there on the 10th, it remained on .the same barge in the same harbor until the 28th, when it was burned. It is urged, in explanation by counsel for the receivers, that when all the circumstances existing in Cairo at that time are duly and fairly considered, press of business, limited facilities, the precedence of cotton coming on steamboats to that arriving on barges, etc., the 18 days between the arrival and the destruction of the cotton do not constitute negligence or unreasonable delay on the part of the carrier. And it is also urged that Bowles & Son, agents for the Lancaster Mills at Memphis, knew of the conditions at Cairo when the contract for transportation was made with Nash. It is sufficient to say, with reference to this explanation, that the carrier was bound to know, when he accepted the cotton, that he had or could avail himself of facilities to transport it within a fairly reasonable period. Knowing the conditions at Cairo, he should not have received the cotton at Memphis. It is unnecessary to cite authorities in support of the position that a carrier is not bound to receive freight when he has no facilities for transporting it, or when his line is already overtaxed and congested by freight previously accepted for transportation. The Cairo, Vincennes & Chicago Line was under no obligation to accept or receive freight at Memphis, when it had no ability to transport it to the destined point within a reasonable time. It chose to do so, however, and cannot be relieved from its undertaking because of difficulties in the way of the performance of the contract, when its agent knew of such difficulties at the time the contract was executed.

The contention is made, however, by counsel for receivers, that, even if unusual delay had occurred at Cairo after the arrival of the cotton, and before it was destroyed,—which is denied,—this would not render the receivers liable for the loss of the cotton burned, because such delay would, at the most, only be a remote, and not the proximate, cause of the loss of the cotton by fire. Many well-considered cases have been referred to by the learned counsel for the receivers in support of his position, and it may be that it announces a sound rule. It will be borne in mind, however, that the negligence imputed to the carrier in this case in the petition is not merely delay, but "that the loss of the cotton by said fire was the result of the carelessness and negligence and delay of said receivers while the said cotton was in their possession, in course of transportation in pursuance of the contract of transportation as aforesaid." If mere delay constituted all the alleged negligence to be found in the pleadings and evidence, the question might present less difficulty, for the negligence must be the proximate, and not the remote, cause of the burning, to render the carrier liable. Had lightning set the cotton on fire, or had one of the frequent river storms destroyed it, the delay preceding the accident might not be regarded as the proximate cause of the destruction; and in such or a like case in facts or principle the cases cited by counsel for the receivers, of Railway Co. v. Reeves, 10 Wall. 176; Morrison v. Davis, 20 Pa. St. 171; Denny v. Railroad Co., 13 Gray, 481; St. Louis, I. M. & S. Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 11 Sup. Ct. 554; New York Lighterage & Transp. Co. v. Pennsylvania R. Co., 43 Fed. 172: Hoadley v. Transportation Co., 115 Mass. 304,—and others on that line, would be in point. The petition, however, and the evidence in support of it, go far beyond mere delay, charging and proving satisfactorily that the carrier company, on reaching Cairo with the cotton, on December 10th, did not proceed to North Cairo, where the Cairo, Vincennes & Chicago Line had a wharfboat, from which cotton on that line of transit was carried up an incline by tracks into the cotton shed, to be loaded on cars for the east, but, on the contrary, tied up Barge 49, containing the cotton, a distance of more than one mile, at the foot of Tenth street, at the public levee, in a position, not only exposed to the sparks of passing steamboats, but in close proximity to the tracks of the Illinois Central Railroad upon the top of the levee. A position more exposed to sparks from the numerous vessels in a busy harbor, and from the smokestacks of the engines almost constantly passing on the railroad, could not have been chosen in Cairo. And it was at this exposed point that the barge containing the cotton was moored, till it was destroyed by fire on the 28th of December; the fire originating most likely from sparks emitted from boats on the river or engines on the levee. It is not mere delay, therefore, but negligent delay in a dangerous place, willful, it may be said, and deliberate exposure of the cotton to danger from fire, that fixes the liability of the carrier. The danger could have been foreseen, should have been foreseen, and guarded against.

Another ground of defense, urged apparently with much con-

fidence by counsel for the receivers, is that the owner of the cotton burned on barge 49 expressly assumed the fire risk while the cotton was on the barge, and expressly relieved the Cairo, Vincennes & Chicago Line and its receivers from liability for loss of the cotton by fire while on the barge; or, to put the matter in the language of counsel's brief: "The receivers, by Nash, their agent, purchased and paid for an interest in the insurance of the cotton already effected by the owner in its open policies of insurance issued by the Insurance Company of North America, to the extent of the risk while the cotton was on barge 49. By these contracts the insurance held by the owner inured to the benefit of the receivers to the extent of the risk while the cotton was on barge 49." This defense, and the alleged facts on which it is founded, are controverted and vigorously denied by petitioners. The receivers insist that the shipper assumed the river risk, and produce two instruments of writing purporting to be signed by William Bowles & Son, per Hayes, in support of this view. Nash testifies that the money mentioned in the instruments was for the assumption by Bowles & Son of the river risk. These two papers and Nash's testimony constitute the substance of the receivers' evidence upon the point. The petitioner produces William Bowles, Jr., and Mr. Hayes, who characterize the two papers as forgeries, and deny positively that the shippers, Bowles & Son, ever assumed the "river risk" or insurance risk between Memphis and Cairo. These two witnesses and others do say, however, that Bowles & Son were paid a rebate by Nash of two to eight cents per 100 pounds; that competition at Memphis for eastern consignments was sharp, and the payment of rebates usual, if not universal. The cross-examination of the witnesses upon the disputed point, together with the various circumstances and explanations offered in evidence, satisfies me that the shipper did not assume any such risk; and that, if he was paid anything by Nash in connection with the transportation of the cotton, it was in the nature of a rebate. No other point or question is deemed of sufficient importance to warrant further discussion in the case. There will be a decree in favor of petitioner for $35,867.