### S. B. LOCKE & CO. v. ST. LOUIS–SAN FRANCISCO RY. CO.

(Circuit Court of Appeals, Eighth Circuit. October 2, 1922.)

#### No. 5714.

Carriers ⬅111—Carrier's receivers held not liable for damage to cotton from negligent compression.

A compress company issued to a shipper receipts showing that it held for shipment on shipper's order a stated number of bales of cotton in good condition or to be put in good condition at shipper's expense. On delivery of such clearance receipts to railroad receivers, they issued bills of lading for cotton received in good condition at a tariff rate which

required them to pay for the compression. The cotton was afterward compressed and shipped, but, owing to failure of the compress company to properly condition it by drying before compression, it was damaged before terminal delivery. *Held*, that for conditioning the cotton the compress company was the shipper's agent; that the railroad receivers had a right to rely on the statement in the clearance receipt that the cotton would be properly conditioned before shipment and were not liable for the damage resulting from its not being done.

Carland, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Missouri; Walter H. Sanborn, Judge.

Suit in equity by the North American Company against the St. Louis-San Francisco Railway Company. From a decree dismissing the intervening petition of S. B. Locke & Co., intervener appeals. Affirmed.

Edward A. Haid, of St. Louis, Mo. (Stone, Moon & Stewart, of Muskogee, Okl., on the brief), for appellant.

J. H. Grant, of Oklahoma City, Okl. (W. F. Evans, of St. Louis, Mo., and Kleinschmidt & Grant, of Oklahoma City, Okl., on the brief), for appellee.

Before CARLAND, Circuit Judge, and LEWIS and COTTERAL, District Judges.

COTTERAL, District Judge. The appellant intervened in the consolidated action of North American Company v. St. Louis & San Francisco Railroad Company, wherein receivers were appointed, claiming damages from the purchaser of the railroad property, on the ground that the receivers negligently caused and permitted several cotton shipments to be damaged after delivery to them in good condition at Sapulpa and Muskogee, Okl., for transportation to New Orleans. It was alleged that delivery was made to the receivers by turning over compress tickets for the cotton issued by local compress companies with which the receivers had working arrangements the terms of which were unknown to the intervener, that thereupon the receivers issued to intervener bills of lading, copies of which were exhibited, whereby they undertook to safely, carefully, and diligently transport the cotton, and deliver the same at destination to intervener's agents, and that the intervener complied with all the terms of the contract imposed upon it and gave the notice as therein provided.

The receivers and successor company answered denying delivery of the cotton by the compress tickets, but admitting issuance of the bills of lading, and under their terms the transportation of the cotton to destination, denying that they caused or permitted the injury or damage to the cotton, attributing it to the intervener, and denying that the intervener was the lawful holder of the bills of lading or complied with their terms. They further alleged that they did not have the means or opportunity of examining the cotton and knowing its condition when tendered to them, but that the intervener knew it was damaged when shipped and the bills of lading were procured, reciting it was in good condition. They denied the value of the cotton as claimed, and al-

leged that the damages were not claimed within the time limited in the bills of lading, and that, if the cotton was damaged, it was not due to their negligence.

The controversy was referred to a special master, who took the evidence, and reported the facts, with his conclusion that the intervening petition should be dismissed. The exceptions to the report were overruled, and it was confirmed, by the court; and the petition was dismissed.

At the hearing evidence was introduced by the intervener only, and the facts are not in dispute. It appears that the cotton was bought by the intervener and concentrated at the compresses in Sapulpa and Muskogee, the receivers issued bills of lading for its transportation, and by means of drafts attached to them the intervener drew on the consignees at New Orleans, and that afterwards the cotton was compressed and shipped. The cotton was damaged by compression when wet, causing it to become discolored, caked, and rotten, and it was in that condition at destination, with resultant loss to intervener. The question presented to the District Court and here is whether the receivers are liable for the failure to condition the cotton by drying it before compression; and it depends upon the facts as to their possession and control of the cotton and the law applicable to such facts.

In part the master found:

"When the cotton arrived at the compress, it was weighed and inspected for damage by the compress company, and a receiving record and weight sheet and compress tickets covering the individual bales of cotton were issued to intervener by the compress company; thereupon intervener paid the freight charges on the cotton and surrendered the bills of lading on which the cotton moved into the compress points. When intervener desired to ship the cotton to other points, it gave to the compress company a shipping order calling for each individual bale, and also surrendered to the compress company the compress tickets, whereupon the compress company gave to the intervener a receipt for the compress tickets showing that it held that number of bales of cotton in good condition, or to be put in good condition at intervener's expense, for delivery to the railroad company designated by intervener. When these compress clearances were surrendered to the railroad company, the latter issued to intervener its bill of lading for the outbound movement of the cotton."

Three tariff rates were open to intervener, viz. 81½ cents for shipment of cotton without compression, 61½ cents for shipment after compression at shipper's expense, and 71½ cents for shipment after compression at the carrier's expense; and this last named rate was selected and paid by the intervener. Of the two clearances obtainable from the compress companies for cotton delivered to them, the intervener selected the form which required the shipper to put the cotton in proper condition if it was found damaged, or in a condition unsuitable for compression.

Quoting further from the master's findings:

"Intervener's instructions to the compress companies, during the 1913 cotton season, were that the compress company should put in proper condition all cotton delivered to it by intervener when necessary before the issuance of the shipping order by intervener to the railroad company and before the delivery of the cotton to the railroad company for outbound shipment. The expense of conditioning this cotton was borne by intervener. * * *

"The evidence further shows, and I find the fact to be, that it was customary for the railroad, in order to accommodate intervener, to issue its bill of lading for the outbound movement of the cotton on surrender of the compress company's clearances by intervener, in order that intervener might procure a draft on the purchaser of the cotton, attach thereto the bill of lading, and forward it for collection prior to the time that the cotton was actually delivered to the railroad. These bills of lading were prepared by intervener and submitted to the railroad for execution, and the actual loading of the cars was performed by intervener or the compress company. The drafts issued, as above stated, were paid, as I find from the evidence, some time prior to the actual delivery of the cotton to the railroad; the time of such payment usually being many days or weeks before the cotton was so delivered."

And the District Court, in an opinion sustaining the master, said:

"There seems to be no doubt that the cotton was first placed by the intervener after it bought it of merchants or producers in the country, in the exclusive possession and control of the compress company, on its premises at several stations on the line of the railroad; that it made a contract with this compress company to pay it for properly conditioning it, that is to say, properly drying the cotton or causing it to be dry immediately before and at the time it should be compressed, and that for this promise of payment the compress company agreed so to condition it that the primary and sole cause of the damage was that the cotton was not properly conditioned at the time it was compressed, but was then so full of moisture that upon its compression it caked and rotted; that the receivers employed the same compress company to compress the cotton, and that they then transported it; that at the request of the intervener they had issued bills of lading for the transportation of the cotton before it was actually compressed; and that the cotton remained in the actual physical possession of the compress company from the time the intervener caused it to be delivered on the premises of that company, soon after he purchased it, until, after its compression, it was placed on the cars of the receivers for transportation."

Conclusions of the court were that the cause of the damage to the cotton was the failure to have it dry when compressed; that the duty to have it in that condition rested on the intervener; that the intervener contracted with the compresser company to discharge that duty and put the cotton in its possession and control for that purpose; that the intervener held out the company to the receivers as qualified to condition it for compression and shipment and to determine when it was so conditioned; that the receivers had the right to rely on the company in these respects as the agent of the intervener; that the receivers had no notice or knowledge of the compression of the cotton in a wet condition; that there was no breach of their contract of handling and transportation of the cotton or liability therein; and that the fact that the compress company was the agent of the receivers to compress the cotton did not charge them with notice of the failure of duty by the company.

Although the issuance of the bills of lading for the cotton antedated the compression of it and they reserved the privilege to the carriers of compressing it, they do not conclusively fix the responsibility upon the receivers for the negligent compression. As a matter of law, a shipper may effectively reserve such right to deal with the property as to assume and relieve the carrier of the duty that it would otherwise assume. 10 Corpus Juris, 224; Kansas City, M. & O. Ry. Co. v. Cox, 25 Okl. 774, 108 Pac. 380, 32 L. R. A. (N. S.) 313. Referring to the liability of a carrier where it had the duty of compression, the Supreme

Court has said, in Iron Mountain Railway v. Knight, 122 U. S. 93, 7 Sup. Ct. 1139 (30 L. Ed. 1077):

"This, however, could only be when the specific goods, as the property of the plaintiffs, were delivered for that purpose into the exclusive possession and control of the defendant. Such was not the case in the present instance. No specific bales of cotton, as the property of the plaintiffs, separate from all others, were delivered to the defendant for them until the 525 bales in controversy were set apart and delivered to the defendant for immediate transportation on its cars; and prior to that time all cotton received in the warehouse to be compressed was received as the property of Potter, on his account, and subject, so far as grading, classifying, and marketing were concerned, to his control, and none of it could be considered as having passed into the possession of the defendant as a common carrier for transportation until designated and set apart by Potter or his agents."

It is not questioned in the present case that the intervener paid a rate of transportation that would cover the expense of compression of the cotton; that the compression was a matter of convenience and advantage to the receivers; that it was contemplated they would secure the compression; and that they did in fact direct it. And, if there were no other facts to be considered, it might well be said they would be liable for the compression of the cotton in an unprepared condition. But the rate selected by the intervener practically effected a payment of the compression charges, and in addition, as the master's findings show, the clearances given to the intervener by the compress company, evidencing their contract, showed the latter held the number of bales in good condition, or to be put in good condition at intervener's expense, for delivery to the carrier it should designate, and upon surrender of the clearances to the carrier it issued bills of lading for the outbound movement of the cotton. Mr. Locke, the vice president and treasurer of the intervener, testified that "the compress has instructions from us to condition all bales before they are compressed at our expense."

It seems clear that the intervener undertook, as the receivers were advised by the clearances, to attend to the compressing of this cotton and control it in a manner that relieved the receivers of any duty concerning it, beyond the mere formality of direction and payment for the compression. And we find no just reason to hold the receivers liable for a failure to put the cotton in proper condition.

This view is confirmed by California Insurance Co. v. Union Compress Co., 133 U. S. 387, 10 Sup. Ct. 365, 33 L. Ed. 730 (cited by the master), where a compress company recovered insurance for loss by fire to cotton in favor of a railroad company after issuance of bills of lading, against the defense that by them there was shown a change of possession which by the policies would avoid the insurance. The court said:

"As to the suggestion that by the bills of lading the possession of the cotton was transferred to the railroad companies, and that the policy was avoided thereby, the answer is that the cotton was still in the hands of the plaintiff, in its actual possession and upon its premises. At most, the railroad companies, by acquiring the receipts of the plaintiff and issuing bills of lading for the cotton, took only constructive possession of it; and the plaintiff, retaining actual and physical possession of it, did not lose any element of pos-

session necessary to give it the right to effect insurance for its own benefit, and, as bailee or agent, for the protection of the railroad companies. All that the railroad companies acquired was the right to ultimate possession, which passed to them by the transfer to them, by the original depositors, of the cotton receipts given by the plaintiff."

The opinion in St. L., I. M. S. Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 11 Sup. Ct. 554, 35 L. Ed. 154 (also cited by the master), lends support to the same conclusion. There a carrier issued bills of lading for cotton received and kept by a compress company in exchange for the warehouse receipts issued by the latter, and insurance companies sought to hold the carrier for reimbursement of losses to the cotton paid to the owner, on the ground of delay in furnishing transportation. The court said:

"Upon the facts of this case, it may well be doubted whether the liability of the railway company as a common carrier began before the cotton had been received upon its cars, and had thereby come into its actual and exclusive possession and control. St. Louis, Iron Mountain & Southern Railway v. Knight, 122 U. S. 79, 93, 95. But, however that may be, the court below clearly went too far in instructing the jury that the railway company, merely by giving bills of lading for the cotton, became responsible for a nuisance resulting from the manner and place in which the cotton was kept by the compress company."

The case of Arthur v. Texas & Pacific Ry. Co., 204 U. S. 505, 27 Sup. Ct. 338, 51 L. Ed. 590, is insistently relied upon by appellant. The action was against a carrier for loss by fire of cotton delivered to a compress company, engaged in compressing cotton for railroad companies. The practice (followed) was that the shipper would obtain a written receipt for the cotton from the compress company, surrender it to the railroad company, and receive for it a bill of lading, and the shipper had nothing further to do with the cotton. The bill of lading issued to the plaintiff specified that the railroad company had the privilege of compressing the cotton at its cost. The compress company did not compress cotton at the orders of the shipper or charge him for storage. It was the general understanding between the railroad company and the compress company that, when the former delivered the cotton receipts to the compress company, the latter was to compress the cotton, obtain the insurance, and ship the cotton on cars pointed out by the railroad company. The cotton was burned while on the platform of the compress company. There were other facts, but they are not essential here. It was held there was a delivery to the railroad company; that the compress company had the custody of the cotton as its agent, and that the question of negligence of the custodian was one for the jury.

This case is readily distinguished in that the owner of the cotton had no control over it after delivery to the compress company, while in the present case, as we have seen, the appellant undertook to attend to the compression, and in that way intercepted the control of it on the part of the railroad company, and hence relieved it of liability.

Other cases have been cited and discussed, but we are persuaded they do not warrant a different conclusion than as has already been indicated we should reach in this case. It is our opinion that the Dis-

trict Court was right in dismissing the intervening petition, and its de-cree to that effect is accordingly affirmed.

CARLAND, Circuit Judge, dissents.